1

**THORPE SHWER, P.C.**
William L. Thorpe (No. 005641)

2

Bradley D. Shwer (No. 022696)
Kristin Paiva (No. 026338)

3

3200 North Central Avenue, Suite 1560
Phoenix, Arizona 85012-2441

4

Telephone: (602) 682-6100
Email: docket@thorpeshwer.com

5

Email: wthorpe@thorpeshwer.com
Email: bshwer@thorpeshwer.com

6

Email: kpaiva@thorpeshwer.com

7

Attorneys for Defendant
BNSF Railway Company

8

9

**UNITED STATES DISTRICT COURT**

10

**DISTRICT OF ARIZONA**

11

Patrick Nolan,

NO. 3:12-cv-08229-PCT-PGR

12

Plaintiff,

**BNSF RAILWAY COMPANY'S MOTION TO (1) EXCLUDE EXPERT OPINIONS OF DAN EMIG, GABRIELA GREGORY, AND DOROTHY WEISS; and (2) LIMIT THE EXPERT OPINIONS OF RICARDO TAN, ROBERT FISHER, AND SPENCER MILLER**

13

v.

14

BNSF Railway Company, a corporation,

15

Defendant.

16

*(Oral Argument Requested)*

17

18

19

BNSF Railway Company ("BNSF") moves the Court pursuant to Rule 37(c)(1),

20

Fed. R. Civ. P., for an order (i) excluding the expert testimony of Dr. Dan Emig,

21

Dr. Gabriela Gregory, Dr. Dorothy Weiss, and any other treating physician that Plaintiff

22

has failed to disclose in accordance with Rule 26(a)(2), Fed. R. Civ. P.; and (ii) limiting

23

the expert opinions of Dr. Ricardo Tan, Dr. Robert Fisher, and Dr. Spencer Miller to only

24

those opinions that were formed during the course of their treatment of Plaintiff and

25

expressly set forth in the medical records attached to Plaintiff's "Initial Disclosures

26

pursuant to Rule 26(a)(2)(b) of the Federal Rules of Civil Procedure." This Motion is

27

supported by the following Memorandum of Points and Authorities and Local Rule 7.2(j)

28

Certification, attached as Exhibit B.

THORPE SHWER, P.C.

8863373

THORPE SHWER, P.C.

# I.   INTRODUCTION

Plaintiff claims he is suffering from a myriad of debilitating conditions, including sleep apnea, insomnia, fatigue, dry eyes, and brain injuries, as a result of inhaling smoke on two separate occasions.  On the court imposed deadline to do so, Plaintiff disclosed the identity of six separate expert witnesses and broadly asserted they would "proffer opinion[s] on the cause of the injury, degree of the injury, future treatment, extent of disability and related medical issues."  [Doc. 52, p. 1].

With respect to three of the six expert witnesses, (Dr. Emig, Dr. Gregory, and Dr. Weiss), Plaintiff disclosed no other information.  With respect to the other three, (Dr. Tan, Dr. Fisher, and Dr. Miller), he merely disclosed a handful of limited medical records.  In an attempt to justify his inadequate disclosure, Plaintiff asserted that, because the experts were all Plaintiff's "treating doctors," "a complete written disclosure of their expert testimony was not required and is not provided."  [Doc. 52, p. 1].

As set forth below, Plaintiff is incorrect.  At a minimum, Rule 26(a)(2)(C), Fed. R. Civ. P., required Plaintiff to disclose a summary of each expert's opinions and the facts relied upon when reaching those opinions—even if the expert is only rendering opinions formed during the course of his or her treatment of Plaintiff.  Further, to the extent Plaintiff intends to elicit any opinions outside those formed during the course of treatment (including opinions related to causation, prognosis, and future medical care and costs), Plaintiff was required to disclose a formal written report adhering to the requirements set forth in Rule 26(a)(2)(B).

Plaintiff's disclosure of Dr. Emig, Dr. Gregory, and Dr. Weiss does neither.  Accordingly, BNSF requests that the Court enter an order excluding Plaintiff from eliciting or relying on the expert opinions of Dr. Emig, Dr. Gregory, and Dr. Weiss.  Similarly, BNSF requests that the opinions of Dr. Tan, Dr. Fisher, and Dr. Miller be limited to only those opinions formed during the course of their treatment of Plaintiff and fully disclosed in the limited medical records accompanying Plaintiff's expert disclosure statement.

8863373

## II.     RELEVANT FACTUAL BACKGROUND

Plaintiff brought claims against his employer, BNSF, under the Federal Employers' Liability Act[1] alleging he suffered significant smoke-inhalation related injuries as a result of two separate locomotive fires occurring on June 27, 2010 and August 14, 2010.  His claimed injuries are extensive and range from dry eyes to sleep conditions to cognitive issues.  Altogether, almost 5,000 pages of medical records have been produced.  Notably, Plaintiff has only produced 91 of those pages.  BNSF, on the other hand, subpoenaed or otherwise obtained the remaining medical records from 71 different custodians.

Pursuant to the Court's Amended Scheduling Order dated June 5, 2013, Plaintiff was required to disclose his expert witnesses no later than August 29, 2013.  [Doc. 47].  On August 29, 2013, Plaintiff served and filed his "Initial Disclosures Pursuant to Rule 26(a)(2)(b) of the Federal Rules of Civil Procedure."  [Doc. 52].

As part of his disclosure, Plaintiff identified the following six "treating doctors": (i) Dr. Ricardo Tan; (ii) Dr. Dan Emig; (iii) Dr. Gabriela Gregory; (iv) Dr. Robert Fisher; (v) Dr. Dorothy Weiss;  and  (vi) Dr. Spencer Miller.   [Doc. 52,  p. 2].   Plaintiff also contended:

> Because none of the treating doctors was retained or specifically employed to provide expert testimony, a complete written disclosure of their expert testimony was not required and is not provided. Plaintiff does include the written reports in his possession that the treating doctors have rendered.

[Doc. 52, p. 1].

Along with his disclosure statement, Plaintiff produced three purported "written reports" for Dr. Tan, Dr. Fisher, and Dr. Miller.  [Doc. 52, p. 2].  Notably, each "written report" consists of a handful of limited medical records created during the course Plaintiff's treatment with each doctor.  [*See* **Exhibit A** for medical records produced with

---

[1] Workers' compensation statutes do not cover railroad employees.  Instead, to recover for an alleged injury, the FELA requires a railroad employee to prove that his employer negligently caused his injuries.  *See* 45 U.S.C. 51 *et seq.*; *see also Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834, 838 (4th Cir. 1987).

THORPE SHWER, P.C.

Plaintiff's expert disclosure statement].  Plaintiff produced no further information or documents related to Dr. Emig, Dr. Gregory, or Dr. Weiss in connection with expert his disclosure.

> Plaintiff, however, vaguely asserted:
>
> Each treating physician is expected to proffer opinion on the cause of the injury, degree of the injury, future treatment, extent of disability and related medical issues that are part of the ordinary care of the patient based on the doctor's personal knowledge, history, treatment of the patient, and facts of his or her examination and diagnosis.

[Doc. 52, p. 1].  Plaintiff has produced no additional disclosures related to his expert witnesses since the deadline.

The deadline for both parties to disclose their rebuttal expert opinions was February 18, 2014.  [Doc. 61].  Neither party made any rebuttal expert disclosures or requested an extension of time to do so.  The deadline to depose expert witnesses is March 10, 2014.  [Doc. 61].  Trial is set to begin on July 22, 2014.  [Doc. 61].  The current scheduling order cautions that its deadlines "shall be enforced, and the Court will not entertain any stipulations to continue them … unless very good cause is shown." [Doc. 61, p. 4].

Pursuant to Local Rule 7.2(j), BNSF's counsel personally consulted with Plaintiff's counsel regarding the issues set forth in this Motion.  Despite its sincere efforts, BNSF has not been able to satisfactorily resolve the matter.  [*See* Local Rule 7.2(j) Certification of William L. Thorpe, attached as **Exhibit B**].[2]

## III.   LEGAL STANDARD

Expert disclosures are governed by Rule 26(a) and must be made at the time the Court orders.  *See* Fed. R. Civ. P. 26(a)(2)(D).  "[I]f the witness is one retained or specifically employed to provide expert testimony in the case," the party's disclosure

---

[2] As part of the Local Rule 7.2(j) personal consultation, Plaintiff's counsel stated on February 25, 2014 that he no longer intended to call Dr. Gregory, Dr. Emig, Dr. Tan, or Dr. Fisher.  In an abundance of caution, and in case counsel changes his position, BNSF includes those doctors in its Motion.

THORPE SHWER, P.C.

1    "must be accompanied by a written report—prepared and signed by the witness…." Fed.

2    R. Civ. P. 26(a)(2)(B). "[I]f a witness is not required to provide a written report, th[e]

3    disclosure must state (i) the subject matter on which the witnesses is expected to present

4    evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the

5    facts and opinions to which the witness is expected to testify." Fed. R. Civ. P.

6    26(a)(2)(C).

7          "Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of

8    any information required to be disclosed by Rule 26(a) that is not properly disclosed."

9    *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

10   Specifically, Rule 37(c)(1) states that a party who fails to make a timely expert disclosure

11   "is not allowed to use that information or witness to supply evidence on a motion, at a

12   hearing, or at trial" unless it proves that its failure was "substantially justified or is

13   harmless." Fed. R. Civ. P. 37(c)(1). "Rule 37(c)(1) is intended to provide a 'self-

14   executing,' 'automatic sanction providing a strong inducement for disclosure of

15   material.'" *Cable v. City of Phoenix*, 2013 U.S. Dist. LEXIS 174847, *12 (D. Ariz.

16   December 13, 2013) (*citing* Fed. R. Civ. P 26(a)(2)(B) advisory committee's note

17   (1993)). "In determining whether this sanction should be imposed, the burden is on the

18   party facing the sanction … to demonstrate that the failure to comply with Rule 26(a) is

19   substantially justified or harmless." *Torres v. City of Los Angeles*, 548 F.3d 1197, 1213

20   (9th Cir. 2008). "If a court concludes that a discovery deadline violation is not

21   substantially justified or harmless, it has 'particularly wide latitude' in its discretion to

22   'issue sanctions under Rule 37(c)(1).'" *Cable*, 2013 U.S. Dist. LEXIS 174847, *11

23   (*citing Yeti by Molly, Ltd.*, 259 F.3d at 1106).

24   . . .

25   . . .

26   . . .

27   . . .

28

THORPE SHWER, P.C.

THORPE SHWER, P.C.

## IV.   LEGAL ANALYSIS

### A. The Court Should Exclude All Expert Opinions Offered By Dr. Emig, Dr. Gregory, Dr. Weiss, And Any Other Treating Physician Plaintiff Has Failed To Disclose In Accordance With Rule 26(a)(2), Fed. R. Civ. P.

The Court should prohibit Plaintiff from relying on the expert opinions of Dr. Emig, Dr. Gregory, and Dr. Weiss because Plaintiff failed to meet even the most basic disclosure requirements with respect to those experts and he cannot demonstrate that his failure to do so was justified or harmless.[3]

This court recently faced a nearly identical set of facts in *Cooke v. Town of Colorado City*, 2013 U.S. Dist. LEXIS 19439, *3 (D. Ariz. February 13, 2013).  There, the defendant sought to strike the testimony of one of the plaintiff's treating physicians, Dr. Alcott, pursuant to Rule 37(c)(1) for failure to timely disclose the doctor's opinions. Specifically, the plaintiff only served a vague expert disclosure statement identifying several medical witnesses and stating:

> The medical witnesses listed above will testify concerning their treatment and diagnoses of [the plaintiff] from the date they began treatment through the date of trial.  They will testify consistently with their medical records, all of which have been provided to [the defendants] …. The doctors will testify at trial concerning the medical condition of [the plaintiff], their diagnoses, the physical limitations on [the plaintiff], the facts establishing and the extent of his disabilities, and his needs for electricity and clean water, his need for accessible housing, including an accessible shower, and the limitations of his physical activity due to his disabilities.  They will also testify as to the effects of stress, cold, and infection on his disability.

*Id*. at *5-6.

After reviewing the disclosure statement, the court concluded, "[t]here is no question that [the plaintiff] failed to meet the requirements of Federal Rule of Civil

---

[3] As part of the Local Rule 7.2(j) personal consultation, Plaintiff's counsel stated for the first time on February 25, 2014 that Plaintiff intended to rely upon the expert opinions of Dr. Thomas G. Dallman.  Plaintiff did not previously identify Dr. Dallman as an expert and has not provided any information regarding the opinions or facts he expects Dr. Dallman to testify about.  Accordingly, BNSF is seeking to exclude Plaintiff from eliciting the opinions of any experts, including Dr. Dallman, that he has not sufficiently disclosed in accordance with Rule 26(a)(2).

THORPE SHWER, P.C.

Procedure 26(a)(2)(C)" because "[a]t no time in their disclosures did [the plaintiff] attempt to state the facts and opinions to which Dr. Alcott was expected to testify." *Id*. at *10-11. Particularly, the court noted that the plaintiff's disclosure statement:

> …advises the reader that the witness will have opinions in certain areas, but fails to state what the opinions are, and the factual basis for those opinions. For instance, this disclosure could mean that the 'medical witnesses' listed would testify that [the plaintiff ] does need electricity or clean water, does need accessible house, and does have limitations on his physical activity due to his disabilities. But it is equally consistent with the witness having exactly the opposite opinion on those subjects.

*Id*. at *11. The court further highlighted the problems with such a general disclosure, noting, "by listing several witnesses with the same description, the disclosure could mean that one witness intends to testify that [the plaintiff] does not need electricity or clean water and another intends to testify that he does need electricity or clean water." *Id*. at *12. The court then went on to observe, "[n]ot only do the disclosures say nothing about the opinions to which the witness intends to testify, but they do not even attempt to state facts supporting such opinions." *Id*. Accordingly, the court held "[the plaintiff's] disclosures regarding Dr. Alcott are woefully inadequate and violate Rule 26(a)(2)." *Id*.

Having determined the plaintiff failed to meet his disclosure requirements, the court next turned to the question of whether the plaintiff could "show that the inadequate disclosure was substantially justified or harmless." *Id*. The court determined that the defendants were prejudiced by the plaintiff's failure to sufficiently disclose Dr. Alcott's opinions because they were unable to disclose a responsive rebuttal witness. *Id*. at *13. In doing so, the court flatly rejected the plaintiff's argument that "if [the] [d]efendants read the documents attached to [his] disclosure statements, Dr. Alcott's medical records, and document produced in response to subpoenas and requests for production, [the] [d]efendants could have gleaned the substance of Dr. Alcott's opinions and the facts to which she would testify." *Id*. In particular, the court reasoned that such logic "would virtually gut the intent and purpose of Rule 26(a)(2)(C)." *Id*. at *14-15. In summary, the court concluded:

THORPE SHWER, P.C.

1

2          The Rule strikes a balance between requiring an expert report from a
           witness like a treating physician, who was not specifically retained
3          to provide expert testimony and requiring a defendant to search
           through hundreds of pages of medical records in an attempt to guess
4          at what the testimony of a treating physician might entail. . . . *If the
           Court were to allow this kind of 'find the Easter Egg' approach, it
5          would allow litigants to manipulate the expert disclosure rule in a
           way that would materially increase the cost of litigation.* An
6          opposing party should be able (and be entitled) to read an expert
           disclosure, determine what, if any, adverse opinions are being
7          proffered and make an informed decision as to whether it is
           necessary to take a deposition and whether a responding expert is
8          needed.

9    *Id*. at *14-15 (emphasis added).  Accordingly, the court granted the defendants' motion to

10   strike the opinions of Dr. Alcott.  *Id*. at *15-16.[4]

11          The present case is no different than *Cooke*.  Indeed, it is undisputable that

12   Plaintiff failed to disclose "a summary of the facts and opinions to which" Dr. Emig,

13   Dr. Gregory, and Dr. Weiss will testify, as required by Rule 26(a)(2)(C)(ii).  Like the

14   plaintiff in *Cooke*, Plaintiff only provided a vague disclosure generally stating that all six

15   medical providers identified would "proffer opinion on the cause of the injury, degree of

16   the injury, future treatment, extent of disability and related medical issues…."  [Doc. 52,

17   p. 1].  Plaintiff provided no additional information related to Dr. Emig, Dr. Gregory, or

18   Dr. Weiss.  He did not disclose the substance of any single opinion or the facts supporting

19   any such opinion.

20          And like the plaintiff in *Cooke*, Plaintiff's failure is not harmless or justified.

21   Particularly, even at this late stage in the litigation, BNSF is uncertain what opinions

22   Plaintiff intends to elicit from each doctor and thus is unable to effectively make an

23   informed decision as to whether it is necessary to take the doctors' deposition (and

24   ─────────────

25          [4] *Cooke* is not unique.  *See*, *e.g*., *Yeti by Molly, Ltd.*, 259 F.3d at 1106 (finding the
     trial court did not err in excluding a damages expert's testimony that was not timely
26   disclosed); *Cable*, 2013 U.S. Dist. LEXIS 174847, *18 (holding exclusion of a treating
     doctor's testimony is an appropriate sanction for failure to disclose as required by
27   Rule 26(a) and stating "[p]laintiff chose to file this lawsuit and bears the burden of
     proving his case"); *Forbes v. 21st Century Ins. Co*., 258 F.R.D. 335, 339 (D. Ariz. 2009)
28   (prohibiting use of documents not timely disclosed under Rule 26(a)).

1    precisely what questions to ask during that deposition) or whether it needs to retain

2    specific responding experts.[5]

3         Furthermore, as the court noted in *Cooke*, Plaintiff cannot avoid the sanctions of

4    Rule 37(c)(1) simply by arguing BNSF should be able to glean the opinions of Dr. Emig,

5    Dr. Gregory, and Dr. Weiss from a review of the medical records and other documents

6    disclosed as part of the litigation.  Significantly, over 5,000 pages of medical records

7    have been produced in this case and Plaintiff is alleging a myriad of serious and complex

8    injuries purportedly resulting from smoke inhalation.  Although BNSF obtained its own

9    experts to provide opinions as to the cause and extent of Plaintiff's medical condition,

10   BNSF certainly could not have been expected to precisely predict what opinions

11   Plaintiff's experts will eventually render, what information those opinions will be based

12   upon, and then seek out experts who can develop corresponding rebuttal opinions.  As the

13   *Cooke* court espoused, to force BNSF to engage in such an "Easter Egg" hunt would gut

14   the disclosure requirements of Rule 26(a).

15        Indeed, even if Plaintiff were to now, for the first time, articulate the opinions he

16   expects these experts to render, BNSF will be at a severe disadvantage.  Particularly,

17   there is virtually no time for BNSF to analyze those opinions, provide those opinions to

18   its own experts (or, even worse, retain experts capable of rebutting the new opinions if

19   necessary), and adequately depose Plaintiff's experts as to their opinions.  Putting aside

20   the fact that expert disclosures are closed, the deadline to depose experts is March 11,

21   2014 (literally two weeks from the date of this Motion).  To force BNSF to incur the

22   costs associated with such an expedited schedule would handicap BNSF.  Moreover, the

23   answer is not simply to push back all remaining deadlines.  This case has been pending

24   since July 2012, and BNSF deserves a final, fair, and timely resolution.

25

26   _____

     [5] The deadline to depose expert witnesses is March 11, 2014.  [Doc. 61].  BNSF
27   only intends to take the depositions of the doctors which are able to provide admissible
     expert opinions.  To the extent the Court does not exclude their opinions, BNSF requests
28   leave from the Court to take these depositions after the March 11, 2014 deadline and to
     supplement its expert disclosures to the extent rebuttal testimony is required.

THORPE SHWER, P.C.

In short, because Plaintiff's disclosures with respect to Dr. Emig, Dr. Gregory, and Dr. Weiss are woefully inadequate, BNSF requests that the Court exclude any expert opinions offered by them in this case.

**B. The Court Should Limit The Opinions Of Dr. Tan, Dr. Fisher, And Dr. Miller To The Opinions Set Forth In The Medical Records Attached To Plaintiff's Disclosure Statement.**

For Drs. Tan, Fisher, and Miller, Plaintiff at least managed to disclose minimal information regarding the facts and opinions he expects them to testify regarding, in the form of a handful of limited medical records. Importantly, these medical records are not "written reports," as required by Rule 26(a)(2)(B) because they are missing several of the requisite components including, *inter alia*, a list of publications and prior trial testimony. *See* Fed. R. Civ. P. 26(a)(2)(B).[6] Consequently, and at minimum, Dr. Tan, Dr. Fisher, and Dr. Miller cannot testify to any opinions that were formed or based on facts received outside the scope of the doctor's direct treatment of Plaintiff. *See Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011) ("Today we join those circuits that have addressed the issue and hold that a treating physician is only exempt from Rule 26(a)(2)(B)'s written report requirement to the extent that his opinions were formed during the course of treatment.").

The opinions of Dr. Tan, Dr. Fisher, and Dr. Miller should be further limited to only those opinions articulated in the medical records accompanying Plaintiff's disclosure statement. As discussed in Section (IV)(A), *supra*, Plaintiff had an obligation to disclose "a summary of the facts and opinions to which [each] witness is expected to testify" in accordance with Rule 26(a)(2)(C) and, for the same reasons previously explained, his failure to do so is not justified or harmless. Thus, to the extent the expert

---

[6] Rule 26(a)(2)(B) requires expert reports to contain "(i) a complete statement of all opinions the witness will express and the basis for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case."

THORPE SHWER, P.C.

1   opinions (and the facts supporting those opinions) are not spelled out in the limited

2   medical records attached to Plaintiff's disclosure statement, the Court should preclude

3   those opinions.  By way of example, none of the medical records posit any opinions as to

4   the cause of Plaintiff's alleged injuries, his prognosis, or his need for ongoing medical

5   treatment; and thus, Plaintiff should not be able to elicit any opinions related to causation,

6   prognosis, or future medical needs.

7   **V.      CONCLUSION**

8          For the reasons set forth above, BNSF requests that the Court (i) exclude all

9   opinions of Dr. Emig, Dr. Gregory, Dr. Weiss, and any other treating physician that

10  Plaintiff failed to disclose; and (ii) limit the opinions of Dr. Tan, Dr. Fisher, and

11  Dr. Miller to only those opinions which were formed during their treatment of Plaintiff

12  and which are fully disclosed in the limited medical records accompanying Plaintiff's

13  expert disclosure.

14         DATED this 25th day of February, 2014.

15                                           **THORPE SHWER, P.C.**

16

17                                    By: _s/ William L. Thorpe_____
                                            William L. Thorpe

18                                          Bradley D. Shwer
                                            Kristin Paiva

19                                          Attorneys for Defendant
                                            BNSF Railway Company

20

21

22

23

24

25

26

27

28

THORPE SHWER, P.C.

11

THORPE SHWER, P.C.

1

## <u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on February 25, 2014, I electronically transmitted the attached

3  document to the Clerk's office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to the following CM/ECF registrants:

5              Dennis M. Elber
           STOLPMAN, KRISSMAN, ELBER & SILVER LLP
6          111 W. Ocean Boulevard, Suite 1900
           Long Beach, CA 90802
7          elber@skes-law.com
           **Attorneys for Plaintiff**

8

9

10                        *s/ Danielle Limon*
                       Assistant to William Thorpe

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12

1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

11

**DISTRICT OF ARIZONA**

12

Patrick Nolan,

NO. 3:12-cv-08229-PCT-PGR

13

Plaintiff,

**ORDER**

14

v.

15

BNSF Railway Company, a corporation,

16

Defendant.

17

18         IT IS HEREBY ORDERED, pursuant to Rule 37(c)(1), Fed. R. Civ. P., that (i)

19    Dr. Dan Emig, Dr. Gabriela Gregory, Dr. Dorothy Weiss, and any other treating

20    physician whose opinions Plaintiff failed to disclose on August 29, 2013 are precluded

21    from testifying at trial; and (ii) the opinions of Dr. Ricardo Tan, Dr. Robert Fisher, and

22    Dr. Spencer Miller are limited to only those opinions formed during the course of their

23    treatment of Plaintiff and expressly set forth in the medical records attached to Plaintiff's

24    "Initial Disclosures pursuant to Rule 26(a)(2)(b) of the Federal Rules of Civil Procedure"

25    filed on August 29, 2013.

26
27
28

8863846

# EXHIBIT A

Dennis M. Elber, Esq. - SBN 70746
Jay A. Kaplan, Esq. - SBN 86202
STOLPMAN, KRISSMAN, ELBER & SILVER LLP
KAPLAN LAW CORPORATION
111 West Ocean Boulevard, Suite #1900
Long Beach, California 90802
Telephone: (562) 435-8300
Facsimile: (562) 435-8304
E-Mail: elber@skes-law.com; jarod@skes-law.com
E-Mail: jkaplan@kaplanlawcorp.com

Attorneys for Plaintiff, PATRICK NOLAN

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK NOLAN, | CASE NO.: CIV 12-08229 PCT PGR |
| Plaintiff, | **PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO RULE 26(a)(2)(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE** |
| vs. | |
| BNSF RAILWAY COMPANY, a corporation, | Trial Date: July 22, 2014 |
| Defendants. | |

TO DEFENDANT AND TO IT'S ATTORNEY OF RECORD HEREIN:

The disclosures made herein are subject to supplemental disclosures as provided under Rule 26(a)(2)(b) of the Federal Rules of Civil Procedure and other applicable laws.

Because none of the treating doctors was retained or specially employed to provide expert testimony, a complete written disclosure of their expert testimony was not required and is not provided. Plaintiff does include the written reports in his possession that the treating doctors have rendered.

Each treating physician is expected to proffer opinion on the cause of the injury, degree of the injury, future treatment, extent of disability and related medical issues that are part of the ordinary care of the patient based on the doctor's personal knowledge, history, treatment of the patient, and facts of his or her examination and diagnosis.

1    Plaintiff expressly reserves the right to add or delete from this disclosure as

2  discovery may warrant.  Without waiving any applicable objections, Plaintiff,

3  PATRICK NOLAN, makes the following disclosure:

4  I.    **WITNESSES**:

5        1.    Dr. Ricardo A. Tan, California Allergy & Asthma Medical Group, 11645 Wilshire

6              Boulevard, Suite 1155, Los Angeles, California 90025. (310) 966-9022

7        2.    Dan Emig, M.D.

8        3.    Dr. M. Gabriela Gregory, Las Vegas, Nevada

9        4.    Dr. Robert Fisher, West Los Angeles Industrial & Urgent Care, 11645 Wilshire

10             Boulevard, Suite 825, Los Angeles, California 90025. (310) 207-3320

11       5.    Dorothy Weiss, M.D.

12       6.    Dr. Spencer O. Miller, The Nevada Neurosciences Institute at Sunrise Health, 3131 La

13             Canada Street, Suite 101, Las Vegas, Nevada 89169. (702) 731-8115

14  II..   **DOCUMENTS**:

15        Plaintiff attaches to this disclosure the following non-privileged documents that

16  he has in his possession:

17       1.    Report and records from Dr. Ricardo Tan/California Allergy & Asthma

18             Medical Group dated August 4, 2010 and September 7, 2010.

19       2.    Report from Dr. Robert Fisher/West Los Angeles Industrial & Urgent Care

20             dated July 25, 2011.

21       3.    Report from Dr. Spence O. Miller/The Nevada Neurosciences Institute

22             dated February 3, 2012.

23  Dated: August 29, 2013          STOLPMAN, KRISSMAN, ELBER & SILVER LLP

24

25                                  By:_____

26                                      Dennis M. Elber
                                        Jarod A. Krissman
27                                      Attorneys for Plaintiff
                                        PATRICK NOLAN

28

1                                          PROOF OF SERVICE

2          I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years
   and not a party to the within action; my business address is: 111 W. Ocean Boulevard, Suite #1900, Long
3  Beach, California 90802.

4          On the date set forth below, I served the foregoing document(s):

5              **PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO RULE 26(a)(2)(B)**
                       **OF THE FEDERAL RULES OF CIVIL PROCEDURE**
6

7  [X]     BY MAIL as follows: I am readily familiar with the firm's practice of collection and processing
           correspondence for mailing.  Under that practice, all mail is deposited with the U.S. Postal
           Service on the same day with postage thereon, fully prepaid at Long Beach, California, in the
8          ordinary course of business.  I am aware that on motion of the party served, service is presumed
           invalid if the postage meter date is more than one day after date of deposit for mailing in the
9          affidavit.  See attached mailing list for addressee(s).

10 [   ]   BY PERSONAL SERVICE: I caused a true and correct copy thereof enclosed in a sealed
           envelope, to be delivered by hand to the addressee(s) listed on the attached mailing list.
11
   [   ]   BY OVERNIGHT COURIER: I caused the above-referenced document to be delivered to an
12         overnight courier service (FED EX, UPS, U.S.P.S. Express Mail, etc.) for delivery to the
           addressee(s) listed on the attached mailing list.
13
   [ ]     BY FACSIMILE TRANSMISSION: I caused the above-referenced document to be transmitted
14         to the addressee(s) at the facsimile number listed on the attached mailing list.

15 [X]     BY E-MAIL/ELECTRONIC TRANSMISSION: Based on a court order or an agreement of the
           parties to accept service by e-mail or electronic transmission [ECF NEF], I caused the above-
16         referenced document to be transmitted to the person at the e-mail address listed on the mailing
           list. I did not receive, within a reasonable time after the transmission, any electronic message or
17         other indication that the transmission was unsuccessful.

18 [ X ]   (State) I declare under penalty of perjury, pursuant to the laws of the State of California, that the
           above is true and correct.
19
   [ ]     (Federal) I declare that I am employed in the office of a member of the bar of this Court at whose
20         direction this service was made.

21         Executed this 29TH day of August 2013, at Long Beach, California.

22

23

24                                              DAISY M. TORRES, Declarant

25

26

27

28

**PATRICK NOLAN v. BNSF RAILWAY COMPANY, et al.**
**Case Number: CIV 12-8229-PCT-PGR**
**Assigned To: Hon: Paul G. Rosenblat**

| | |
|---|---|
| FENNEMORE CRAIG, P.C<br>William L. Thorpe, Esq.  (No. 005641)<br>Bradley D. Shwer, Esq.  (No. 022696)<br>Adam T. Reich, Esq.  (No. 028843)<br>3003 North Central Avenue<br>Suite 2600<br>Phoenix, Arizona 85012-2913<br>Telephone: (602) 916-5000<br>Facsimile:   (602) 916-5999<br>Email: wthorpe@fclaw.com<br>Email: bshwer@fclaw.com<br>Email: areich@fclaw.com | Attorneys for Defendant, BNSF<br>RAILWAY COMPANY |
| Anthony E. Sonnett, Esq. (SBN 163182)<br>Trevor J. Ingold, Esq. (SBN 193227)<br>Eliza A. Langdon, Esq. (SBN 272028)<br>LEWIS BRISBOIS BISGAARD & SMITH LLP<br>221 N. Figueroa Street<br>Suite 1200<br>Los Angeles, California 90012<br>Telephone: (213) 250-1800<br>Facsimile:   (213) 250-7900<br>Email: asonnett@lbbslaw.com<br>Email: tingold@lbbslaw.com<br>Email: elangdon@lbbslaw.com | Attorneys for Defendant, BNSF<br>RAILWAY COMPANY |

03/05/2013  11:58   13109669042                    CAAMG                          PAGE  09/19

# California Allergy & Asthma Medical Group, Inc.

Sheldon L. Spector, M.D.     Ricardo A. Tan, M.D.     Alan O. Khadavi, M.D.
*Board Certified in Allergy and Clinical Immunology*

11645 Wilshire Boulevard, Suite 1155  •  Los Angeles, California 90025  •  Telephone: (310) 966-9022  •  Fax: (310) 966-9042

Patient Name:           Patrick Nolan
Date of Birth:          09/03/53
Age / Sex:              56/M
Date of Consultation:   08/04/10

### HISTORY OF PRESENT ILLNESS:

The patient is a locomotive engineer and has worked at this job on trains for 38 years. On June 27, 2010, while the patient was working in a locomotive train, he noted a fire outside of the cab he was in. It was an electrical fire and it produced fumes to which he was exposed for at least 10 minutes before the train was stopped and he was able to leave the area. He experienced watery eyes, coughing, dizziness, shortness of breath and nausea. He was taken to a hospital and was placed on oxygen inhalation for a short period and then discharged. No tests were done.

He saw his primary care physician several days after the incident. Chest x-ray was done which was unremarkable. Oximetry showed 98% O2 saturation in a resting position and 98% with exercise. He was discharged back to work. No treatment or other tests were done. According to the patient, he continues to have symptoms of sore throat, smoky taste in his mouth, watery eyes, occasional shortness of breath, headaches, dizziness and fatigue. He has found it hard to stay awake during the night when he is working. He usually works at night. He has continued to work at his job as a locomotive engineer. He has not had any subsequent exposure to smoke or fumes. He has a history of chronic nasal congestion and sneezing but he feels that his symptoms increased after the exposure to the smoke. He is an ex-Marine.

### PAST MEDICAL HISTORY:
Diabetes and hypertension. He also had an episode of MRSA in his buttocks but has resolved.

### ALLERGIES:
He has no known food or drug allergy.

### FAMILY HISTORY:
No known history of asthma.

### SOCIAL HISTORY:
He has a smoking history of 1 pack per day for 20 years and he quit 15 years ago.

### PHYSICAL EXAMINATION:

GENERAL:         The patient is 6'2" tall, weighs 255lbs. BP: 121/84, Heart Rate: 65. The patient is comfortable, not in respiratory distress.

Page 1 of 2

CAAMG000005

03/06/2013  11:58     13109669042              CAAMG                          PAGE  10/19

**Re: PNOLAN**

**HEENT:**        No sinus tenderness. Eyes and ears unremarkable. Nose shows mild nasal
                  congestion. Pharynx shows no hyperemia.

**LUNGS:**        Clear

**EXTREMITIES:**  Shows no rash or eczema or edema.

**LABORATORY DATA:**

Spirometry done showed initial FEV1 of 100% of predicted. He was given a bronchodilator
treatment with Levalbuterol and the post bronchodilator FEV1 was 113% which indicated a 12%
increase.  Skin test done to inhalants and pollens showed negative results to pollen, molds, dust
mites and animals.

**REVIEW OF RECORDS:**
Emergency Room Notes from Northern Arizona Healthcare 6/27/10. ER provider: James Hayes,
MD.  Diagnosis: Acute Smoke Inhalation. Oxygen saturation analysis:  98% supine with pulse rate
-77/minute;  98% sitting with pulse rate 90/min; 98% exercise with pulse rate 97/min. Chest –Xray:
No active pulmonary disease.

**DIAGNOSIS:**

The patient has reversible bronchial constriction which is likely related to untreated airway
inflammation from smoke exposure approximately 5 weeks prior to this consult. He also has
chronic non-allergic or vasomotor rhinitis as indicated by negative allergy skin test results.

**PLAN:**

I will place the patient on Advair 100/50 1 puff twice a day to decrease bronchial inflammation and
return his lung function to full capacity. Skin tests were explained to the patient. I have
recommended that he follow up in 3 weeks with his primary care physician for follow-up
evaluation and treatment of his symptoms.

Ricardo A. Tan, MD

Page 2 of 3

03/06/2013  11:58    13109669042              CAAMG                          PAGE  08/19

# California Allergy & Asthma Medical Group, Inc.

### Sheldon Spector M.D.  –  Ricardo Tan M.D.  –  Alan Khadavi M.D.

| | | | | |
|---|---|---|---|---|
| **Patient Name:** | **Nolan, Patrick** | **DOB:** 9/3/1953 | **Age:** | **56** |
| **Today's Date:** | 09/07/10 | **Date of Last Visit:** | 08/04/10 | |

**History:**
Updated: ___ Rev. of Systems ___        ___ Environmental History ___
         ___ Family History ___          ___ Past Medical History ___

*[handwritten clinical notes]*

**Physical Exam:**  Ht 6'2"  Wt 250  T 97.5  P 72  RR 12  BP 127/75  PF ___

| Normal | | Normal | |
|---|---|---|---|
| Skin | | Lungs *clear* | |
| Eyes | | Heart | |
| Nose | | Lymph Nodes | |
| Ears | | Abdomen | |
| Throat/Mouth | | Extremities | |
| Neck | | Other | |

**Procedures:**

**Skin Test Screens:** ___ Combined  ___ Food
**Full:** ___ Combined  ___ Pollens Only  ___ Inhalants Only  ___ Food
**Supplements:** ___ Combined:P/I  ___ Food  ___ Food # 2
                 ___ Spices  _✓ Nitric Oxide  ___

**Other ST:**
✓ Nasal Smear     **Laboratory Blood Tests:**
✓ Spirometry  ✓ PrePost   ___ Patient Education: _____
✓ Nebulizer Therapy: *Xopenex 1-25mg*
Immunizations: _____
___ Other Meds/Procedures in office: _____

| Medicare {CAP} Ivig: NDC# | | Rx# | |
|---|---|---|---|
| Medicare {CAP} Xolair NDC# | | Rx# | |
| **Xolair** | **mg** | **Route** | **Site** | **Lot#** | **Exp. Date:** |

*[obscured/redacted section: DIAGNOSIS, MD Signature, Nurse Signature fields]*

### 11645 Wilshire Boulevard - Suite 1155, Los Angeles, California 90025
### Phone No: (310) 966-9022  -  Fax No: (310) 966-9042

CAAMG000004

03/06/2013  11:58   13109669042          CAAMG                    PAGE  11/19

**Asthma, Allergy and Clinic**
Sheldon L. Spector, M.D.
Ricardo A. Tan, M.D.
11645 Wilshire Blvd., Suite 1155, Los Angeles, CA 90025
Phone: (310) 966-9022 - Fax: (310) 966-9042

# PATIENT HISTORY

Today's Date: _8 - 4 - 10_

Name of Patient: _P. D. Nolan_     Who Completed this form? _Pat Nolan_
Address: (Street) _4924 Calle Del Media_    (City) _Fort Mahave_    (State) _AZ_
Home Ph. (928) 263-2556     Work Ph. (___) ___    Occupation: _Locomotive Engineer_

Briefly describe your problem(s)  _Exposed to Electrical smoke on cab_
_of Engine with_

---

## ALLERGY HISTORY REVIEW

| (check one) | Yes | No |
|---|---|---|
| Do your eyes itch? | | |
| Do your eyes water? | ✓ | |
| Are your eyes red? | ✓ | |
| | | |
| Are your ears clogged? | | |
| Do your ears itch? | ✓ | |
| Has your hearing decreased? | | |
| | | |
| Is your nose congested? | | |
| Do you have nasal discharge? | | |
| Do you sneeze? | | |
| Does your nose itch? | | |
| Do you get frequent colds? | | |
| | | |
| Does your mouth itch? | | |
| Do you get sore throats? | | |
| Do you have post nasal drip? | | |
| | | |
| Do you cough? | | |
| Are you short of breath? | | |
| Do you wheeze? | | |
| Wheeze with exercise? | | |
| Wheeze with laughter? | | |
| | | |
| Does your skin itch? | | |
| Do you have hives? | | |
| Is your skin red in places? | | |
| Does your scalp itch? | | |

| Which of the following cause symptoms: (check) | eyes | nose | ears | throat | skin | cough | wheeze |
|---|---|---|---|---|---|---|---|
| Spring | | | | | | | |
| Summer | | | | | | | |
| Fall | | | | | | | |
| Winter | | | | | | | |
| Change in weather | | | | | | | |
| Change in temperature | | | | | | | |
| Windy conditions | | | | | | | |
| Exercise | | | | | | | |
| | | | | | | | |
| House dust | | | | | | | |
| Work dust | | | | | | | |
| Moldy conditions | | | | | | | |
| Animal exposure | | | | | | | |
| | | | | | | | |
| Foods (list) | | | | | | | |
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| | | | | | | | |
| Smog | | | | | | | |
| Exhaust fumes | | | | | | | |
| Cleaning fluids | | | | | | | |
| Perfumes | | | | | | | |
| Cold temperatures | | | | | | | |
| Newsprint | | | | | | | |
| Tobacco smoke | | | | | | | |

CAAMG000007

Case 3:12-cv-08229-DLR   Document 72   Filed 02/25/14   Page 23 of 61

07/13/2013  11:08  Case 3:12-cv-08229-PGR   Document 32   Filed 08/29/13   Page 1 of 3   85385  P.002/004
89/15/2011  11:04  3186285566

# WEST LOS ANGELES INDUSTRIAL
# & URGENT CARE

11645 Wilshire Boulevard, Suite 825
Los Angeles, California 90025
(310) 207-3320  Fax: (310) 207-2486

**ROBERT FISHER, M.D.**
Diplomate, American Board of Internal Medicine

*Richard M. Hyman, M.D.*
*Medical Director*

*Noel C. Laurente*
*Administrator*

July 25, 2011

Railroad Retirement Board

RE: PATRICK NOLAN
EMPL: BNSF Railway

INTERNAL MEDICINE CONSULTATION

To Whom It May Concern:

I examined Patrick Nolan on 7/13/11 in followup at my office at 11645 Wilshire Boulevard, Los Angeles, California 90025.

The patient returns today following a neuropsychological evaluation by Dr. Dorothy Weiss, Ph.D., performed on 4/27/11.

Dr. Weiss, in her history and examination, felt that the patient was indeed suffering from cognitive disorder. She felt that there were certain areas of intact functioning and other areas of definite cognitive impairment.

She noted the areas of impairment included visual memory functioning for free recall of information. She also noted visual recognition memory range in the low average to average. He exhibited impairment in more complex visual spatial/constructional ability and also has some mild word retrieval deficit.

She felt that Mr. Nolan exhibited certain areas of frontal executive impairment including impaired concept formation, rule application, complex mental flexibility, complex alternating sustained attentional skill, verbal fluency/left frontal lobe function and planning/organizational approach for more complex material. She also noted that his GDS score of 9 indicated that although he indicated certain depressive symptoms, he was not at a clinically significant level of depression at the time of her evaluation.

She further goes on to state that his neurocognitive functioning on present testing indicates variable functioning with certain areas of intact function and other areas of cognitive compromise.

RE: PATRICK NOLAN                                                        Page 2
July 25, 2011

Therefore, he exhibits specific areas of cognitive impairment but his overall
neurocognitive picture does not meet the full criteria for a dementia diagnosis at this time
from a neuropsychological standpoint.

Mr. Nolan continues, however, to complain of difficulty with his thought processes and
his symptoms have not changed since previous examinations.

## PHYSICAL EXAMINATION:

His physical examination today is unchanged.  His blood pressure continues to be normal
at 125/68.  His weight is 235 pounds and he is 6'3" tall.

HEENT: Normal.

Heart: Normal.

Lungs: Normal.

## DIAGNOSTIC TESTING:

The patient did undergo some diagnostic testing in that he had a CAT scan of his head
done at the Valley View Medical Center.  The findings were an asymmetric enlargement
of the right lateral ventricle.  No obvious density abnormality was seen on this
nonenhanced CAT scan.

An MRI of the brain could be performed for further evaluation to look for a possible
abnormality at the foramen of Monro and contrast should be utilized.

This was interpreted by Dr. Dan Emig.  The test was performed on 6/23/11.

Also on 6/23/11 the patient had a CAT scan of the facial bones which revealed minimal
mucosal thickening of the ethmoid air cells, minimal nasal septum deviation to the right
and patent ostiomeatal units.

It should be noted that in her report, Dr. Weiss recommended that Mr. Nolan undergo
both structural and functional neuroimaging (brain MRI and PET scan) as part of his
present neurocognitive workup.

RE: PATRICK NOLAN                                         Page 3
July 25, 2011


## CURRENT MEDICATIONS:

At the present time, Mr. Nolan continues with a number of medications including his Fresh Kote eye drops three times a day, Bayer aspirin 81 mg daily, Lipitor 40 mg daily, Bystolic 5 mg daily, Glyburide 5 mg daily, Isosorbide 30 mg daily, Actos 15 mg daily, Lisinopril 20 mg daily, Tamsulosin 4 mg daily, Singulair 10 mg daily, Effient 10 mg daily, Advair discus 100/50 two puffs daily and Nasacort nasal spray two puffs in each nostril daily.

## DISCUSSION:

It is recommended that the patient undergo the tests suggested by Dr. Weiss including the MRI and PET scan of the brain, especially since unilateral ventricular enlargement was demonstrated on a noncontrast CAT scan.

The impression continues to be that the patient has indeed some cognitive impairment which apparently began after the patient inhaled smoke from the fires to which he was exposed while performing his duties as a locomotive engineer.

Thank you for the opportunity of seeing this patient. He will be seen in followup subsequent to his diagnostic studies.

Thank you for referring Mr. Nolan for evaluation and report. If I can be of any further assistance, please feel free to contact me.

Sincerely,

ROBERT FISHER, M.D.

RF/jel/shb
Encl: Statement

 **The Nevada Neurosciences Institute** at Sunrise Health

**3131 La Canada Street, Suite 101 · Las Vegas, NV 89169**
**Phone (702)731-8115 · Fax (702)784-7844**

**February 03, 2012 11:25 AM**

**PATIENT:** NOLAN, PATRICK

**REQUESTING PHYSICIAN:** Self-referral

**IDENTIFICATION AND CHIEF COMPLAINT:**
The patient is a 57-year-old right-handed Caucasian male complaining of cognitive decline, headaches, light-headedness, and insomnia with reported onset after two episodes of smoke inhalation. This is an initial evaluation.

**HISTORY OF PRESENT ILLNESS:**
He states he experienced his first smoke inhalation injury on June 26, 20010 when he noted a fire in the engine room of his locomotive, and he inhaled the smoke for approximately 10 minutes before being able to exit the train. He saw his primary care physician several days later and had negative chest x-ray, 98% oxygen saturation with exercise, and thus was released back to work without limitations shortly thereafter. He saw Dr. Ricardo Tan / Allergist on August 04, 2010 who felt his condition was likely reversible bronchial constriction likely related to untreated airway inflammation from smoke exposure. He experienced a second smoke inhalation injury on August 16, 2010 during a work related electrical fire as an engineer on a locomotive train. He states that prior to the first smoke inhalation injury, he was without complaints, but afterward, he noted development of pulmonary difficulties, holo-cranial, intermittent headaches in variable locations on his scalp and deep in his head with associated light sensitivity and nausea. He also complains of nightly insomnia, having difficulty falling and staying asleep, and only getting about 5-6 hours of sleep per night (sleep study completed just before this encounter – results pending at the time of the encounter). He also complains of memory deficits including short-term and long-term, though short-term seems worse to him. He has noted difficulty with patience and he describes himself as quick to anger. He prefers to be alone at times, but can tolerate a crowd (i.e., church). He often finds lack of enjoyment in certain activities or foods that once were more pleasing to him. Of his symptoms that have persisted since the reported injuries, his considers his inability to achieve restful sleep as the worst and most debilitating of his conditions. He has noted no improvement in his symptoms since the onset.

For sleep, he has tried Trazodone, Lunesta, and Ambien with variable efficacy, but all seeming to cause nightmares / night terrors that make the medications intolerable. Lunesta has caused the least amount of nightmares of the medications. He is not currently exercising due to insomnia. He states his gait is non-magnetic but slowed compared to before. He states he has very low exercise tolerance, including walking, as it makes his very light-headed and with heavy exertion, he has passed out. He notes progressive

NNI000008

increase in stinging / burning sensation in his fingers and toes, mainly at night, and he states he is not sure if this is from his chronic diabetes or other process. He denies any seizure or seizure-like activity. He denies any bowel or bladder dysfunction / incontinence. He had a single reported head injury from a high school football impact with reported brief loss of consciousness only.

I extensively reviewed his prior records, work up, and evaluation by multiple subspecialties. He saw Dr. Jude J. Santiago / Ophthalmologist from November 19, 2010 through October 21, 2011 for dry eyes and a tear duct damage, which this doctor feels are likely related to prior smoke inhalation injury. He saw Dr. Richard Hyman / Cardiologist from November 29, 2010 and December 6, 2012, who diagnosed the patient with coronary artery disease and commented on an angioplasty and cardiac stent placement without myocardial infarction, and most recent catheterization showing patent coronary arteries. He saw Dorothy Weiss, Ph.D. / Neuropsychologist for formal Neurocognitive Evaluation on April 27, 2011, which concluded that the patient had "cognitive deficits in visual memory functioning for free recall of information, more complex visual-spacial / constructional ability, mild word retrieval deficits, impaired concept formation rule application, complex mental flexibility, complex alternating and sustained attention skill, verbal fluency, and planning / organizational approach for more complex material. Although he exhibited specified areas of cognitive impairment, his overall neurocognitive picture did not meet full criteria for dementia."

Of further note, the patient has recently begun a vegetarian-like diet and has not discussed this with a nutritionist, in particular with regard to vitamin and dietary supplementations necessary to continue a vegetarian diet.

He voiced no additional complaints to me today.

**PAST MEDICAL HISTORY:**
1. Hypertension
2. Coronary Artery Disease
3. Hyperlipidemia
4. Diabetes Mellitus
5. Peripheral Neuropathy (first noted per records on January 30. 2012 by Dr. Mohamed Ahmed, M.D. / Cardiologist)
6. B12 Deficiency (reported, untreated)
7. Recurrent MRSA Infections

**PAST SURGICAL HISTORY:**
1. Right Recurrent Coronary Artery Stent Placement - 2010
2. Right knee operation – 1985
3. Left knee operation – 1980
4. Appendectomy

**CURRENT MEDICATIONS:** has changed some medications without medical advice
1. Lunesta 3mg orally at night
2. Metoprolol 25mg orally twice daily
3. Lisinopril 20mg orally daily
4. Isosorbide Mononitrate 3mg orally daily

NNI000009

5. Glyburide 5mg orally twice daily
6. Effient 10mg orally daily
7. Lipitor 40mg orally at night
8. Aspirin 81mg orally daily

**ALLERGIES:**
1. No known drug allergies.

**FAMILY HISTORY:**
1. He has family history of hypertension, diabetes, and headaches, but no dementia or other neurologic disorders.

**SOCIAL HISTORY:**
1. Retired train / locomotive engineer
2. Denies alcohol or recreational drug abuse. He has a history of marijuana, cocaine, speed, and alcohol abuse in the past, but has been sober since rehabilitation over 25 years ago.
3. He quit smoking about 15 years ago.

**REVIEW OF SYSTEMS:**
Ten-point review of systems was performed and negative other than that which is mentioned in the HPI.

**PHYSICAL EXAMINATION:**
Vital Signs:   Weight: 238 lb. Temp 97.0. Pulse 59. Respi: 18. Blood pressure 119/73.
General:       well-nourished, well-developed female in no acute distress.
HEENT:         Normocephalic, atraumatic. Sclerae are anicteric. Oral mucosa is pink and moist. Some tenderness to palpation in various scalp regions, but no overt occipital region pain.
CARDIOVASCULAR: regular rate and rhythm, no murmurs, rubs, or gallops noted; no carotid or vertebral bruits auscultated; normal peripheral vasculature and capillary refill.
PULMONARY: clear to auscultation throughout, unlabored respirations
EXTREMITIES: no noted edema
SKIN:          no visible rash
NEUROLOGIC:
Mental status:  awake and alert, oriented to person, place, time and situation. Basic from MMSE were performed and he missed repetition of one of three objects after distraction, but was able to concentrate and complete all the rest of the test without problems.
Speech: intact.
Language: intact to naming, fluency, repetition, and comprehension consistently.
Cranial nerves:
II: visual fields full to confrontation, pupils briskly reactive to light and accommodation; fundoscopic exam was normal without evidence for papilledema, disc edema, Drusen, or hemorrhages.
III/IV/VI: extra-ocular motility was symmetric with no overt nystagmus.
V: facial sensation was intact and symmetric to light touch and temperature.
VII: symmetric smile
VIII: symmetric, though he states somewhat impaired.

NNI000010

IX/X: uvula midline, palate elevates bilaterally

XI: strap muscles are 5/5 and symmetric motor strength.

XII: tongue is midline with no fasciculation or atrophy.

Motor: normal motor strength without fasciculations, or tender points, but with some tremor with fatigue (i.e., arms outstretched for 30 seconds).

Reflexes: bilateral triceps, biceps, brachioradialis, knee jerks and ankle jerks; symmetric, no clonus noted.

Sensory: moderate-to-severe distance-dependent relatively symmetric sensory loss to light touch, temperature, vibration, and pinprick up to the knees and past the wrists.

Coordination: grossly normal

Cerebellum: no cerebellar signs noted, including past-pointing, tremor, ataxia, apraxia, dysdiadochokinesia, or other cerebellar signs.

Gait: normal; no magnetic gait, no hesitancy, normal steppage and arm swing. Good gyration / rotation as well including in close quarters and open room.

Romberg: negative

## DIAGNOSTICS:

1. I reviewed reports provided. PET Scan of the Brain (August 12, 2011) demonstrated prominence of the lateral ventricles potentially due to decrease in activity in the periventricular white matter, moderate diffuse relative decrease in the activity in the cerebellar cortex, possible mild decrease in activity in the posterior watershed region (i.e., small vessel disease), and no features at that time to suggest a neurocognitive process.

2. I reviewed reports provided. CT scan of the Brain (June 23, 2011) demonstrated asymmetric enlargement of the right lateral ventricle, no obvious density or abnormality is seen on this non-enhanced CT.

3. I reviewed reports provided. MRI brain with and without contrast (August 11, 2011) demonstrated slightly asymmetric right lateral ventricle without parenchymal signal abnormality. Based on quantitative analysis, the hippocampal volume is low for the patient's age and the infero-lateral ventricular volume and lateral ventricular volume are within 1 standard deviation of average. These are not suggestive for underlying mild cognitive impairment.

4. I reviewed reports provided. Laboratory data from January 30, 2012 demonstrated elevated HbA1C (6.1), normal TSH, and hyperlipidemia.

5. Echocardiogram (January 30, 2012) demonstrating LVEF of 55% and radionuclide showing fixed inferior scar.

6. Carotid Dopplers (January 30, 2012) demonstrating normal patent carotid arteries bilaterally.

## PERTINENT DIAGNOSES:

1. Cognitive Decline / Mild Cognitive Impairment.
2. Sleep Disturbances / Insomnia.
3. Headaches
4. Likely Depression / Anxiety
5. B12 Deficiency
6. Peripheral Polyneuropathy (diabetic, B12 deficiency, other).
7. White Matter Lesions on MRI brain of unknown significance.

NNI000011

**IMPRESSION:**

The patient presents for initial evaluation by self-referral for chronic pervasive insomnia, cognitive decline (mainly short-term memory loss), random headaches, light-headedness, and chronic progressive peripheral polyneuropathy, and reported B12 deficiency. His main concern is his lack of ability to achieve restful sleep, and I feel that many of his complaints, although seeming to have originated after two episodes of smoke inhalation in 2012, are likely now more related to fatigue compounding some chronic co-morbidities (i.e., diabetes, diabetic peripheral neuropathy, etc.) and some more acute and post-injury co-morbidities (i.e., potential chemical exposure, potential nutritional deficiencies, white matter changes noted on MRI brain, pulmonary impairment, headaches, etc.). Prior extensive work up was reviewed, and most subspecialists and his primary care physician appear to concur that the majority of his complaints originated from the smoke inhalation injuries. He does not appear to have a genetic / inheritable / primary neurologic process that would cause cognitive decline based on history and imaging. Imaging is consistent with chronic smoke inhalation injuries and non-diffuse, deep white matter brief hypoxia. From a neurologic perspective, more advanced white matter lesions and post-inhalation injuries can cause early cognitive decline that may or may not be progressive. Sleep disturbances are also common after various mechanisms of brain injury, and this may also be a potential source for his insomnia. He complains of symptoms that could be consistent with depression, which is also a contributor to sleep disturbances and cognitive decline. He is maintaining his activities of daily living per his own report.

Although there are many potential sources for cognitive decline in this patient, I will evaluate for the more likely potential sources first. As the patient has established primary care in his home town, I will make the following recommendations and have the patient present to his primary care physician to have the recommendations ordered and addressed. Much of the work up is within the spectrum of primary care, and therefore, care can be directed through his local physician based on results. If there are outliers that need subspecialty address, I will gladly assist if requested.

Optimization of sleep, healthy lifestyle / exercise regimen, well-rounded diet, and reduction in depressive-like symptoms / depression is the most likely mechanism by which the patient can improve his outcome with regard to cognitive function.

I recommend the following:

1. Primary Care Physician follow up to review recommendations and the encounter for further direction of care / co-morbid management.
    a. Below recommendations.
    b. Sleep study results / necessary treatment.
    c. Optimization of diabetic control.
    d. Other co-morbid conditions.
2. I am awaiting sleep study results. I have requested them through the clinic. A copy should also be forwarded to his primary care physician for review as well.
3. Laboratory Data:   CBC with differential, Complete Metabolic Panel (including liver panel and renal function), B12, folate, thiamine, pyridoxine, Vitamin D

NNI000012

profile, ANA profile, ESR, C-Reactive Protein, Manganese, Copper, and Ceruloplasmin.

4. Ophthalmology follow up as scheduled (he states already scheduled February 17, 2012). With discoloration in the iris, I recommend Wood's Lamp and follow up diabetic eye evaluation in specific.

5. Medications:

   a. We discussed possibility for Elavil as a treatment option for the headaches, peripheral pain, depression (minor anxiety), and sleep disturbances. This medication can be optimized with slow up-titrations (i.e., 10 milligrams starting dose, then up-titrate by 10 milligrams every 4-5 nights up to 50 milligrams at night, then increase in increments of 25milligrams up to a preferred maximum dosage of 125 milligrams each night, and only at night within 30-60 minutes of sleep).

   b. I recommended to him to start oral supplementation with daily multivitamin as well as B-complex vitamins (to include B12, folate, thiamine, pyridoxine – at a minimum). He agreed to do so.

   c. He states he only takes Metoprolol once daily, but I feel he is likely on a twice daily regimen, and this will need to be clarified with his primary.

   d. He states he is taking his sleep aides (i.e., Lunesta, Ambien, Trazodone) at variable intervals and dosages that he decides upon without his physician's direction. I discussed with the patient the need to address compliance with sleep aides with his primary, and to only take these medications as directed in writing from his physician. He agreed to do so.

6. Sleep Hygiene was extensively discussed, including consistent lights out time, consistent alarm wake up without snooze, setting the 'mood' for sleep with no stress, exercise, television, or internet within 1 hour of lights out time, and avoidance of caffeinated beverages after noon. He understood and agreed to comply.

7. Nutrition Consultation recommended, as he has begun a vegetarian-like diet and is not taking B-vitamin supplementation. Please send for consultation in order to optimize his intake and to avoid potentially harmful nutritional deficiencies that may worsen his underlying condition.

8. B-12 injections (based on results) monthly, as deficiency is known to be a potential etiology for cognitive impairment and polyneuropathy.

9. If labs, sleep study, and completion of above recommendations fail to improve his overall symptomatology, I recommend formal Neuro-Cognitive therapy including cognitive behavioral therapy and directed compensatory mechanisms for his specific needs.

10. Distant Neurology Clinic follow up can be obtained by request, but I encouraged the patient to seek his care from his primary physician for closer follow up and more comprehensive care than obtained in a subspecialty clinic such as Neurology. He expressed his appreciation and understood my requests.

11. If there are any additional requests from Neurology, please do not hesitate to contact me.

Thank you for the pleasure of assisting in the management of this patient.

Spencer O. Miller, M.D.

NNI000013

CC:   Dr. Dallman, his primary care physician.
       Patient.

NNI000014

# EXHIBIT B

1

**THORPE SHWER, P.C.**
William L. Thorpe (No. 005641)

2

Bradley D. Shwer (No. 022696)
Kristin Paiva (No. 026338)

3

3200 North Central Avenue, Suite 1560
Phoenix, Arizona 85012-2441

4

Telephone: (602) 682-6100
Email: docket@thorpeshwer.com

5

Email: wthorpe@thorpeshwer.com
Email: bshwer@thorpeshwer.com

6

Email: kpaiva@thorpeshwer.com

7

Attorneys for Defendant
BNSF Railway Company

8

9

10

## UNITED STATES DISTRICT COURT

11

## DISTRICT OF ARIZONA

12

Patrick Nolan,                                    NO. 3:12-cv-08229-PCT-PGR

13

               Plaintiff,            **LOCAL RULE 7.2(J)**
**CERTIFICATION OF PERSONAL**

14

v.                                                **CONSULTATION**

15

BNSF Railway Company, a corporation,

16

               Defendant.

17

18

      Pursuant to Local Rule 7.2(j), the undersigned certifies the following:

19

      1.     After personal consultation and sincere efforts to do so, counsel has been

20

unable to satisfactorily resolve the issues raised by BNSF Railway Company's Motion to

21

(1) Exclude Expert Opinions of Dan Emig, Gabriela Gregory, and Dorothy Weiss; and

22

(2) Limit the Expert Opinions of Ricardo Tan, Robert Fisher, and Spencer Miller (the

23

"Motion").

24

      2.     Specifically, on February 24, 2014, Dennis Elber and I sent extensive

25

emails regarding the issues presented in the Motion, including BNSF's details concerning

26

belief that Plaintiff's expert disclosures were deficient under the rules.  [*See* email string

27

dated 2/24/2014 – 2/25/2014 between Mr. Thorpe and Mr. Elber, attached as **Exhibit 1**].

28

8863899

THORPE SHWER, P.C.

3.     On February 25, 2014, I personally spoke at length with Mr. Elber on the telephone regarding the issues presented in BNSF's Motion.  During our conversation, Mr. Elber represented for the first time that he was no longer intending to call Dr. Emig, Dr. Gregory, Dr. Tan, or Dr. Fisher as witnesses at trial.  Mr. Elber, however, stated that he still intended to call Dr. Weiss, Dr. Miller, and another doctor Plaintiff had not previously disclosed, Dr. Thomas Dallman.

4.     Notably, during the telephone conversation, Mr. Elber did not dispute that his expert disclosures were deficient under the Rules.

5.     Following our telephone conversation, Mr. Elber sent to me a "rough draft of plaintiff's supplemental" disclosure, implicitly acknowledging the deficiencies in Plaintiff's previous disclosures.  [*See* email string dated 2/25/2014 between Mr. Elber and Mr. Thorpe, attached as **Exhibit 2**].

6.     The "rough draft," however, is still woefully deficient and consists of disjointed and incomplete "cut and pasted" portions from unidentified records.  [*See* "draft" of Plaintiff's First Supplemental Disclosure Statement Pursuant to Rule 26((a)(1) [sic] and Rule 26(a)(2)(b) of the Federal Rules of Civil Procedure, attached as **Exhibit 3**].  The disclosure also appears to supplement the disclosure of some of the doctors Mr. Elber previously claimed Plaintiff was no longer intending to call.  [*Id.*]

7.     Also after our telephone conversation, I sent Mr. Elber an email asking him to confirm that Plaintiff would not call Dr. Fisher at trial and that BNSF could cancel his deposition scheduled out of town the following day.  Despite telling me 90 minutes earlier that he would not be calling Dr. Fisher, Mr. Elber responded  by stating he did not know whether Plaintiff would call Dr. Fisher, "but would be very surprised" if he did.  Mr. Elber further stated that BNSF could cancel the deposition and then further discuss with him whether his deposition needs to go forward.  [*See* email dated 2/25/2014 between Mr. Thorpe and Mr. Elber, attached as **Exhibit 4**].

2

8863899

8.      BNSF agreed to cancel the deposition in an effort to help mitigate the costs associated with unnecessary discovery, which would include, among other items, Dr. Fisher's fees and travel costs.  [*Id.*]

9.      Thus, after good faith efforts to do so, counsel has not been able to satisfactorily resolve the issues set forth in the Motion.

DATED this 25th day of February, 2014.

By: _____
William L. Thorpe

THORPE SHWER, P.C.

3

8863899

# EXHIBIT 1

**Jodi Taylor**

| | |
|---|---|
| **From:** | Dennis Elber <elber@skeslaw.com> |
| **Sent:** | Tuesday, February 25, 2014 12:11 PM |
| **To:** | William Thorpe |
| **Subject:** | RE: Nolan v. BNSF - Personal Consultation |

That works.

---

**From:** William Thorpe [mailto:wthorpe@thorpeshwer.com]
**Sent:** Tuesday, February 25, 2014 9:21 AM
**To:** Dennis Elber
**Cc:** Kristin Paiva; William Thorpe
**Subject:** RE: Nolan v. BNSF - Personal Consultation

Sure.  How about 1:30 your time?

---

**From:** Dennis Elber [mailto:elber@skeslaw.com]
**Sent:** Tuesday, February 25, 2014 10:03 AM
**To:** William Thorpe
**Subject:** RE: Nolan v. BNSF - Personal Consultation

Bill: 9:30 will not work. Can we make it early afternoon my time? Thanks. Dennis

---

**From:** William Thorpe [mailto:wthorpe@thorpeshwer.com]
**Sent:** Monday, February 24, 2014 3:39 PM
**To:** Dennis Elber
**Cc:** Brad Shwer; Kristin Paiva; William Thorpe
**Subject:** RE: Nolan v. BNSF - Personal Consultation

Dennis:  It looks like we have very different views on this topic.  I will call you tomorrow at 9:30 a.m. your time if that works for your schedule.  Thanks.  Bill

---

**From:** Dennis Elber [mailto:elber@skeslaw.com]
**Sent:** Monday, February 24, 2014 3:54 PM
**To:** William Thorpe
**Subject:** FW: Nolan v. BNSF - Personal Consultation


Bill,
I have copied from our designation of the treating doctors:

Because none of the treating doctors was retained or specially employed to provide expert testimony, a complete written disclosure of their expert testimony was not required and is  not provided.  Plaintiff does  include the written  reports in his possession that the treating doctors have rendered. Each treating physician is expected to proffer opinion on the cause of the injury, degree of the injury, future treatment, extent of disability and related medical

issues that are  part of the ordinary care of the patient based on the doctor's  personal knowledge, history, treatment of the patient, and facts of his or her examination and diagnosis.

Please remember that I came into this case after I applied to the Court on May 13, 2013.  The file was in another lawyer's possession and control and I did the best I could to wade through it to provide the appropriate disclosures and discovery. I will assume that your email is inquisitive as  to how we can make sure your depositions are meaningful and you are not prejudiced in any way. Otherwise, it would appear that my cooperation in extending deadlines to secure medical records for both of us and your retained experts is being rewarded with a strategic "gotcha"  because you waited until just after my responsive expert designation was due to send this "objection."  I gave you the reports I had in my possession, told you what I expected the treating doctors to address and you are now deposing them.  I quickly found the following case and it seems our clients and the court's resources would be better served if we work together to address any concerns you have. If you want a supplemental designation in advance of the depositions, I will certainly do that.
In any event, I will not agree to limiting any of the doctors testimony as you request.  I am not in the office today but will be available tomorrow. If you will give me a time that is convenient and whether you wish to initiate the call, we can discuss this and other discovery matters.
Thanks
Dennis

H

**Warning this link may be malicious, it actually goes to the site "web2.westlaw.com" while displaying: Flonnes v. Property & Cas. Ins. Co. of Hartford**
Not Reported in F.Supp.2d, 2013 WL 2285224
D.Nev., 2013.

## A. *Rule 26(a)(2)(C) Treating Physician Disclosure*

*\*3 Generally, a treating physician is not retained or specially employed to provide expert testimony as he or she is a percipient witness of the treatment rendered. However, in <u>Goodman v. Staples The Office Superstore, LLC, 644 F.3d 817, 826 (9th Cir.2011)</u>, the Ninth Circuit addressed the situation of "hybrid" experts and provided guidance regarding when a treating physician must prepare a <u>Rule 26(a)(2)(B)</u> report. Goodman confirms that a treating physician is not required to make a <u>Rule 26(a)(2)(B)</u> report to the extent the treating physician's opinions are formed during the course of treatment and limited to the scope of treatment rendered. <u>644 F.3d at 826</u>.*

*This does not end the Court's inquiry as <u>Rule 26(a)(2)</u> requires a specific disclosure of information by experts not required to provide a written report. See <u>Fed.R.Civ.P. 26(a)(2)(C)</u>. Specifically, as indicated above, when identifying experts who are not retained or specially employed, such as treating physicians, a party must state the "subject matter" on which the witness is expected to testify and "a summary of the facts and opinions" to which the witness is expected to testify. See <u>Fed.R.Civ.P. 26(a)(2)(C)</u>.*

Both the *Rule 26(a)(2)(B)* written report and the *Rule 26(2)(C)* disclosure "share the goal of increasing efficiency and reducing unfair surprise." *Brown v. Providence Medical Center, 2011 WL 4498824 *1 (D.Neb.).* *Rule 26(a)(2)(C)* requires the timely disclosure of a "summary of the facts and opinions" to which a proposed witness will testify. In interpreting *Rule 26(a)(2)(C)*, a District Court in Virginia found, that whatever its precise meaning, "a 'summary' is ordinarily understood to be an 'abstract, abridgement, or compendium .... [i]t follows that Plaintiffs cannot comply with the rule by disclosing the complete records of the treating physicians in issue." *Kristensen ex rel. Kristensen, 2011 WL 5320686 *2 (W.D.Va.).* The Court agrees that the production or disclosure of medical records, standing alone, is not sufficient to satisfy the requirements of *Rule 26(a)(2)(C)*. While medical records undoubtedly touch on the subject matter of a treating physician's testimony, they do not necessarily provide an accurate or complete summary of expected testimony since medical records are not typically created in anticipation that those records would be used as a witness disclosure.

## B. *Rule 26(e) Supplementation*

*Rule 26(e)* provides:

A party who has made a disclosure under *Rule 26(a)* ... must supplement or correct its disclosure or response ... in a timely manner if the party learns that in some material respect the disclosure is incomplete or incorrect or if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

*Rule 26(e)* creates a duty to supplement, not a right. See *Luke v. Family Care and Urgent Medical Clinics, 323 Fed. Appx. 496, 500 (9th Cir.2009)* (holding district court did not abuse its discretion in excluding untimely expert declarations). *Rule 26(e)* does not create a "loophole" for a party who wishes to revise its initial disclosures to its advantage after the deadline has passed. Id. Indeed, supplementation means "correcting inaccuracies ... based on information that was not available at the time of the initial disclosure." Id. (citing *Keener v. United States, 181 F.R.D. 639, 640 (D.Mont.1998)* (finding second disclosure so substantially different from first that it could not qualify as a correction of an incomplete or inaccurate expert report)).

*\*4* Consequently, expert disclosures must be supplemented when a party "learns that in some material respect the information disclosed is incomplete or incorrect" but only "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." *Fed.R.Civ.P. 26(e)(1).* The supplementation requirement of *Rule 26(e)(1)* is not intended to permit parties to add new opinions to an expert report based on evidence that was available to them at the time the initial expert report was due. See *Toomey v. Nextel Communications, Inc., 2004 WL 5512967, \*4 (N.D.Cal.);* see also *Salgado v. General Mot ors Corp., 150 F.3d 735, 743 (7th Cir.1998).* Indeed, the Ninth Circuit has recently emphasized that the expert disclosure deadline must be taken seriously. *Wong v. Regents of the University of California, 379 F.3d 1097, 1103–1105 (9th Cir.2004)* (affirming exclusion of untimely disclosed expert under Rule 37(c)(1) and finding no substantial justification or harmlessness).

.

## 2. Dr. Cash, Dr. Mortillaro, Dr. Lemper, Dr. Shah, and Dr. Tang

Defendant requests an order striking the disclosure and precluding the testimony of Plaintiff's proposed experts Dr. Cash, Dr. Mortillaro, Dr. Lemper, Dr. Shah, and Dr. Tang based on Plaintiff's failure to disclose the information required by *Rule 26(a)(2)(B-C)*. Defendant asserts that no written report was provided for these physicians or a summary of facts or opinions to which they are expected to testify. Further, Defendant

*claims that Plaintiff used the same boilerplate statement for each witness disclosure, which fails to state what treatment each witness will testify on, what injuries the witness observed and will opine on, what medical treatments were necessary, what charges were incurred, and diagnoses given. See Def.'s Reply # 52, 3–4. In contrast, Plaintiff asserts that these treating physicians are percipient witnesses that are exempt from the written report requirement of Rule 26(a)(2)(B) and a summary of the subject matter on which they are expected to testify was provided in the initial disclosures. See Pla.'s Resp. # 47, 3. Plaintiff further argues that treatment records are sufficient to put Defendant on notice of the testimony these physicians intend to offer at trial.*

*The Court finds that the initial witness disclosure of Dr. Cash, Dr. Mortillaro, Dr. Lemper, Dr. Shah, and Dr. Tang fails to comply with Rule 26(a)(2)(B). Plaintiff seeks to cure this failure by arguing that, in addition to being retained experts, these witnesses are treating physicians who do not have to make disclosures under Rule 26(a)(2)(B), but rather, can satisfy Rule 26(a)(2)(C). However, identification of the subject matter on which the witness is expected to testify is insufficient to comply with the summary of facts and opinions requirement of Rule 26(a)(2)(C). See Carrillo v.. B & J. Enterprises, LLC, 2013 WL 394207 (D.Nev. Jan. 29, 2013) (finding deficient Rule 26(a)(2)(C) disclosures warranted sanction of limiting witness testimony to opinions formed in the course of treatment).*

*Furthermore, the fact that Defendant has received medical records from these treating physicians does not cure Plaintiff's deficient Rule 26(a)(2)(C) disclosure. See Schultz v. Ability Ins. Co., 2012 WL 5285777 (N.D.Iowa) (reference to medical records, without more, does not satisfy the disclosure requirement of Rule 26(a)(2)(C)); Smith v. Barrow Neurological Institute, 2012 WL 4359057 (D.Ariz.) (referring to medical records associated with a treating physician fails to meet the requirements of Rule 26(a)(2)(C) and is grounds to strike experts); Lopez v. Keeshan, 2012 WL 2343415 (D.Neb.) (same); Ballinger v. Casey's General Store, Inc., 2012 WL 1099823 (S.D.Ind.) (permitting a party to provide medical records in lieu of a summary "would invite a party to dump a litany of medical records on an opposing party" and is contrary to "summary" requirement of Rule 26(a)(2)(C)); Davis v. GEO Group, 2012 WL 882405 (D.Colo.) (medical records insufficient under Rule 26(a)(2)(C), but amended disclosure permitted in light of time remaining before trial); Brown v. Providence Medical Center, 2011 WL 4498824 (D.Neb.) (disclosure of medical records insufficient as "court will not place the burden on Defendants to sift through medical records in an attempt to figure out what each expert may testify to."); Kristensen, 2011 WL 5320686 ("Plaintiffs cannot comply with [Rule 26(a)(2)(C) ] by disclosing the complete records of treating physicians in issue."). Here, in a manner inconsistent with Rule 26(a)(2)(C), Plaintiff attempts to assert that Defendant can sift through medical records in an attempt to figure out what testimony may be given by the identified physicians. The Court finds Plaintiff has failed to comply with the disclosure requirements of Rule 26(a)(2)(C) for proposed experts Dr. Cash, Dr. Mortillaro, Dr. Lemper, Dr. Shah, and Dr. Tang.*

## II. Rule 37(c) Sanction

*\*6 Once it is determined, as here, that a party has failed to provide information required by Rule 26(a)(2)(C) or 26(e), then "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed.R.Civ.P. 37(c)(1). Rule 37(c) "gives teeth" to the requirements of Rule 26(a) and Rule 26(e) so courts are given a particularly wide latitude to issue sanctions under Rule 37(c)(1). Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1106 (9th Cir.2001) (holding district court did not abuse its discretion in excluding testimony of defendant's only damages expert as a sanction). Generally, the exclusion penalty is "self-executing" and "automatic." Hoffman v. Constr. Protective Servs., Inc., 541 F.3d 1175, 1180 (9th Cir.2008) (noting Rule 37(c)(1)'s exclusion sanction provides a strong inducement for disclosure of material and affirming district court's preclusion of undisclosed damages evidence).*

4

*The party facing sanction has the burden of showing that any failure to disclose is substantially justified or harmless. See Yeti, 259 F.3d at 1107. The factors that may properly guide a court in determining whether a violation is substantially justified or harmless are: (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence. Manneh v. Inverness Medical Innovations, Inc., 2010 WL 3212129, *2 (S.D.Cal.2010) (finding failure to disclose certain documents and witness not harmless where opposing party was unable to prepare its defense in time for trial).*

*As has already been examined, the production of medical records is not sufficient to satisfy the disclosure requirements of Rule 26(a)(2)(C). Also, Rule 26(e) does not create a "loophole" for a party who wishes to revise its initial disclosures to its advantage after the deadline has passed. Luke, 323 Fed. Appx. At 500. Indeed, supplementation means "correcting inaccuracies ... based on information that was not available at the time of the initial disclosure." Id. Thus, the Court concludes that Plaintiff has failed to comply with the disclosure requirements of Rule 26(a)(2)(C) proposed experts Dr. Cash, Dr. Mortillaro, Dr. Lemper, Dr. Shah, and Dr. Tang. The Court must now decide what sanction, if any, is appropriate under Rule 37(c).*

*Defendant contends that Plaintiff has no substantial justification for not complying with Rule 26(a)(2) as the requirements are clear and unambiguous. Further, Defendant argues that Plaintiff's non-compliance is prejudicial, and therefore, not harmless, because of the discovery deadlines. Defendant needs time to prepare for a meaningful cross-examination of these potential expert witnesses, decide which ones should be deposed, and obtain a rebuttal expert. In response, Plaintiff argues that preclusion of these physicians would be would be a disproportionately severe sanction because the failure to disclose, if any, was harmless. Plaintiff notes that Defendant has known of the identify of the proposed expert witnesses since April 2011 and Defendant's expert, Dr. Derek Duke, performed a record review of the medical records provided by these treating physicians in November 2011.*

*\*7 Although not substantially justified, the Court finds that, under the specific circumstances of this case, Plaintiff's failure to properly disclose under Rule 26(a)(2)(C) is harmless. The five physicians were listed in Plaintiff's initial disclosure. Defendant does not contend that the disclosed treatment records were unreasonably voluminous. Additionally, Defendant had sufficient time to review the records and for its expert to produce a report considering the treatment records.*

*Additionally, the motion is being decided before any depositions have taken place and prior to the close of discovery. See Bookhamer v. Sunbeam Products, Inc., 2012 WL 6000230 (N.D.Cal.). Indeed, the Court has extended the discovery cutoff and rebuttal expert deadlines. See Order # 45. Unlike in Carrillo, where the undersigned limited the proposed expert testimony to opinions formed in the course of treatment, depositions do not need to be conducted for a second time nor does discovery need to be reopened. 2013 WL 394207. While Plaintiff should not be allowed to use his failure to comply with Rule 26 to his strategic advantage, the Court finds that the severe sanction requested, striking five proposed experts and precluding their testimony at trial, does violence to the disposition of this case on its merits and less drastic sanctions are available. As a result, the Court declines to strike Plaintiff's disclosure of and testimony by Dr. Cash, Dr. Mortillaro, Dr. Lemper, Dr. Shah, and Dr. Tang. Nevertheless, the Court will require Plaintiff to provide disclosure of Dr. Cash, Dr. Mortillaro, Dr. Lemper, Dr. Shah, and Dr. Tang in compliance with Rule 26(a)(2)(C) to Defendant within fourteen (14 days).*

---

**From: William Thorpe [mailto:wthorpe@thorpeshwer.com]**
**Sent: Monday, February 24, 2014 12:55 PM**
**To: Dennis M. Elber (elber@skes-law.com)**

*Cc: William Thorpe; Kristin Paiva*
*Subject: Nolan v. BNSF - Personal Consultation*


*Dennis:*

*As you know, the deadline for all expert disclosures in this matter has passed.  Upon review, we believe Plaintiff's expert disclosures are deficient under the applicable rules.  Specifically, for experts not otherwise required to provide a written report, Rule 26(a)(2)(C) requires the party to disclose a summary of the facts and opinions to which each expert witness is expected to testify.*

*Because Plaintiff has provided no information with respect to Dr. Emig, Dr. Gregory, and Dr. Weiss, we believe their expert opinions should be excluded entirely.  Additionally, we believe the opinions of Dr. Tan, Dr. Fisher, and Dr. Miller should be limited to only those opinions formed during the course of their treatment of Plaintiff and set forth in the few medical records attached to Plaintiff's expert disclosure statement.*

*We are prepared to file a motion with the court seeking to exclude/limit the doctors' testimony in this way.  Pursuant to the local rules of the court, however, we are required to first personally consult with you to determine whether we can resolve the matter without the court's involvement.*

*Accordingly, I plan to call you later this afternoon to discuss whether you are willing to enter into a stipulation (i) excluding the expert opinions of Dr. Emig, Dr. Gregory, and Dr. Weiss; and (ii) limiting the expert opinions of Dr. Tan, Dr. Fisher, and Dr. Miller to only those opinions formed during the course of their treatment of Plaintiff and set forth in the medical records attached to Plaintiff's expert disclosure statement.*

*I look forward to discussing this issue with you.*


*Bill*

# EXHIBIT 2

**Jodi Taylor**

| | |
|---|---|
| **From:** | Dennis Elber <elber@skeslaw.com> |
| **Sent:** | Tuesday, February 25, 2014 4:02 PM |
| **To:** | William Thorpe |
| **Cc:** | 'Dennis Elber'; 'KLC Secretary' |
| **Subject:** | Emailing: PLAINTIFF'S SUPPLEMENTAL DISCLOSURE |
| **Attachments:** | PLAINTIFF'S SUPPLEMENTAL DISCLOSURE.pdf |

Bill
This is a rough draft of plaintiff's supplemental. I will have a complete and formal one served on you in the next day or so. However, since Dr.
Fisher's deposition is tomorrow, I wanted to get this to you as soon as possible. You will see that there is nothing new because I have copied portions of your retained experts summaries of involved medical records.
Thanks
Dennis

Your message is ready to be sent with the following file or link attachments:

PLAINTIFF'S SUPPLEMENTAL DISCLOSURE

Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types of file attachments.  Check your e-mail security settings to determine how attachments are handled.

1

# EXHIBIT 3

Dennis M. Elber, Esq. - SBN 70746
Jay A. Kaplan, Esq. - SBN 86202
STOLPMAN, KRISSMAN, ELBER & SILVER LLP
KAPLAN LAW CORPORATION
111 West Ocean Boulevard, Suite #1900
Long Beach, California 90802
Telephone: (562) 435-8300
Facsimile: (562) 435-8304
E-Mail: elber@skes-law.com; jarod@skes-law.com
E-Mail: jkaplan@kaplanlawcorp.com

Attorneys for Plaintiff, PATRICK NOLAN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK NOLAN, | CASE NO.: CIV 12-08229 PCT PGR |
| Plaintiff, | **PLAINTIFF'S FIRST SUPPLEMENT DISCLOSURE STATEMENT** |
| vs. | **PURSUANT TO RULE 26((a)(1) and RULE 26(a)(2)(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE** |
| BNSF RAILWAY COMPANY, a corporation, | |
| Defendants. | Trial Date: July 22, 2014 |

TO DEFENDANT AND TO IT'S ATTORNEY OF RECORD HEREIN:

The disclosures made herein are subject to supplemental disclosures as

provided under Rule 26(a)(2)(b) of the Federal Rules of Civil Procedure and other

applicable laws.

Because none of the treating doctors was retained or specially employed to provide expert testimony, a complete written disclosure of their expert testimony was not required and is not provided. Plaintiff does include the written reports in his possession that the treating doctors have rendered.

Each treating physician is expected to proffer opinion on the cause of the injury, degree of the injury, future treatment, extent of disability and related medical issues that are part of the ordinary care of the patient based on the doctor's personal knowledge, history, treatment of the patient, and facts of his or her examination and diagnosis.

Plaintiff, PATRICK NOLAN, makes the following supplemental disclosures pursuant to defendant pursuant to Federal Rules of Civil Procedure, Rule 26(a)(1) and Rule 26 (a)(2). These disclosure are subject to amendment and supplementation as discovery and Plaintiff's investigation of the relevant facts continue. **Supplements are bolded**.

**As way of foundation:**

**FELA provides that every common carrier by railroad engaged in interstate commerce is "liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier...." 45 U.S.C. § 51. In Rogers v.**

Missouri Pacific R. Co., 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957), the U.S.

Supreme Court held: "Under this statute the test of a jury case is simply whether the

proofs justify with reason the conclusion that employer negligence played any part, even

the slightest, in producing the injury or death for which damages are sought." Accord,

Consolidated Rail Corporation v. Gottshall, supra; Webb v. Illinois Central R. Co., 352

U.S. 512, 77 S.Ct. 451, 1 L.Ed.2d 503 (1957).

In Claar v. Burlington Northern Railroad Co. (C.A.9, 1994), 29 F.3d 499, 503, the court

emphasized that FELA plaintiffs must prove that a causal link exists between the

defendant's negligence and the plaintiff's injury: "It is true that under FELA the quantum

of evidence sufficient to present a jury question of causation is less than it is in a common

law tort action. Pierce v. Southern Pacific Trans. Co., 823 F.2d 1366, 1370 (C.A.9,

Cir.1987). "'B]ecause of the relaxed standards applied in FELA .... suits, we do not believe

that a medical expert must be able to articulate to a 'reasonable degree of medical

certainty' that the defendant's negligence had a causal relationship with the injury and

disability for which the plaintiff seeks damages. Instead, we believe that such a medical

expert must be able to articulate that it is likely that the defendant's negligence, or more

than possible that the defendant's negligence, had a causal relationship with the injury and

disability for which the plaintiff seeks damages.'" Mayhew v. Bell S.S. Co., 917 F.2d 961,

963,964 (6th Cir.1990)(quoting Moody v. Maine Cent. R.R. Co., 823 F.2d 693, 695 (1st

Cir.1987))

Each of the below listed  treating physicians will opine on the causal link between the

incidents of June 27, 2010 and August 14, 2010 and plaintiff's injuries, disability and

damage.  They will opine on the causal link between those injuries and plaintiff's

premature retirement as a railroad worker. They will opine on whether Plaintiff's pre-existing conditions and symptoms affected  Plaintiff's ability to regularly execute the duties, functions and responsibilities of his job with Defendant.  They will opine on whether Plaintiff's pre-existing conditions and symptoms would have affected Plaintiff's long term plans to continue working in his job with Defendant absent the incidents of June 27, 2010 and August 14, 2010. They will opine on how plaintiff's post incidents injuries and symptoms have affected his earning capacity.  They will opine on the permanence of the injuries, conditions and symptoms caused by the incidents of June 27, 2010 and August 14, 2010 and the effect on plaintiff's activities of daily living. They will opine on the nature and extent of the exacerbations caused to plaintiff's pre-existing conditions by the incidents of June 27, 2010 and August 14, 2010.

I.   **<u>WITNESSES</u>**:

    1.    Dr. Ricardo A. Tan, California Allergy & Asthma Medical Group, 11645 Wilshire

<u>Dr. Ricardo Tan - California Allergy & Asthma Medical Group, Inc.:</u> Note on 9/7/10 indicates that he has reversible bronchia constriction which is likely related to untreated airway inflammation from smoke exposure.  He also has chronic non-allergic or vasomotor rhinitis as indicated by negative allergy skin tests results.  He recommended Advair.

    Boulevard, Suite 1155, Los Angeles, California 90025. (310) 966-9022

    2.    Dan Emig, M.D.

This report has been relied upon by plaintiff's treating physicians and defendant's retained

experts. Plaintiff expects that this witness will not be called unless required for

foundational purposes.

PROCEDURE PERFORMED: CT OF HEAD WITHOUT CONTRAST – 06/23/2011

CLINICAL INDICATIONS: Headache.

TECHNIQUE: Multiple helical axial CT images were obtained through the head without contrast.

COMPARISON: None.

FINDINGS: The right lateral ventricle appears asymmetrically larger than the left lateral ventricle. There is no definite low density to suggest edema within the brain. No obvious mass is seen on this nonenhanced CT. There is no evidence of an acute intracranial hemorrhage. No midline shift is identified. The gray/white matter junction appears intact.

IMPRESSION:
THERE IS ASYMMETRIC ENLARGEMENT OF THE RIGHT LATERAL VENTRICLE. NO OBVIOUS DENSITY ABNORMALITY IS SEEN ON THIS NONENHANCED CT. AN MRI OF THE BRAIN COULD BE PERFORMED FOR FURTHER EVALUATION TO LOOK FOR A POSSIBLE ABNORMALITY AT THE FORAMEN OF MONROE. CONTRAST SHOULD BE UTILIZED.

3.    Dr. M. Gabriela Gregory, Las Vegas, Nevada

**Dr. Gregory was named inadvertently. She is a colleague of Dr. Miller's.**

4.    Dr. Robert Fisher, West Los Angeles Industrial & Urgent Care, 11645 Wilshire

Boulevard, Suite 825, Los Angeles, California 90025. (310) 207-3320

saturation level was normal so he was released from the hospital. However, he had continued symptoms with headache, light-headedness, sleepiness, shortness of breath, and nausea and these did not improve. After his return from the first episode, he was falling asleep easily even while driving the train. He has light-headedness, chest and stomach discomfort, and a cough. He was told he had 12 percent loss of lung capacity by Dr. Tan and his regular physician saw some abnormality on chest x-ray. He drinks three cups of coffee and three cups of tea per day.

he is forgetful. Note indicates that he related an incident in which he picked up his boots at

work and there was some exposure.  He had an increase in symptoms for 5 days, which included shortness of breath, nausea, light-headedness and an increase in fatigue.  He also experienced the same bad taste in his mouth as he did when he was stranded in the cab of the train.

He has been married twice with two stepchildren.  He doesn't drink, smoke or use drugs. He has not worked since 8/14/10. He has a variety of nonspecific symptoms that cannot actually be tested in an objective manner, but they are commonly seen in work injury evaluations in people who have had inhalations.  He has headache, shortness of breath, lightheadedness, nausea and chest discomfort, as well as fatigue and falling asleep. He recommended against his working at this time as a locomotive engineer due to his symptoms. Note on 9/10/10 indicates complaints of dizziness on 8/16/10 and then developed symptoms of headache, sinus problems, dry cough and shortness of breath following the second fire on 8/14/10. He returned to work after the first incident after two days. The first fire was an electrical insulation fire; the second fire was a traction motor smoke fire.  He noted that the records reviewed from

he is not working because of fatigue and other symptoms, but mostly because he was falling asleep driving the train.  The patient recently developed chest pain and was hospitalized.  A stent was placed in the right coronary artery and he is now in cardiac rehabilitation. He recommended against returning to work until he has completed cardiac rehabilitation and a stress test is done. He recommended against driving a train and indicated that his fatigue limits him from doing so.

to the cost of the evaluation at UCLA.  Recommendations included not returning to work at this time. Note from Dr. Richard Hyman's assistant on 4/18/11 indicates that he is precluded from working on or around trains.  He is totally disabled from any kind of employment at this time and will be reevaluated on 4/27/11 by Dr. Flyer. Plans to evaluate for memory testing were trying to be arranged. Note on 4/27/11 indicates that he continues to report fatigue, lightheadedness, dizziness, and the symptoms noted in prior reports resulting from the inhalation episodes in 2010 while working as an engineer for BNSF Railway.  Based on his ongoing complaints and his more recent complaints of memory loss, he is unable to work at this time.

5.    Dorothy Weiss, M.D.

he continues to have symptoms which have deteriorated from the standpoint of memory, confusion, having to write everything down and being short-tempered. A neuropsychiatric evaluation was recommended to see if he has objective neurologic deficits and whether these are consistent with the type of the job injury he had. Note on 2/25/11 recommended against return to work and a neuropsychological evaluation was recommended. Note on 3/10/11 indicated that he had noticed increased problems with memory and found it necessary to write things down or he would forget them. A neuropsychological evaluation was recommended at UCLA to determine whether or not this is related to the inhalations or to increasing depression as a result of the smoke inhalations on the train. Note on 3/16/11 from Dr. Brian Flyer indicates that until his memory evaluation can be undertaken, he should not work at all for the next 90 days at minimum. Note on 3/21/11 by Dr. Flyer indicates that the patient worked for BNSF Railway for 38 years and went on disability because of 2 inhalations (6/27 and 8/18/10) due to electrical fires. His initial symptoms included cough and shortness of breath. He complains currently of ongoing fatigue, daytime dizziness, abnormal taste sensation, abnormal throat sensation and abnormal voice. Complains that his memory is limited. Note on 4/15/11 indicates that he continues to report memory loss at this time, causing him to be concerned. He finds he is forgetting more than he reported earlier this year. He still complains of fatigue, light-headedness, dizziness and the symptoms noted in prior reports. A plan to pursue neuropsychological testing with Dr. Dorothy Weiss instead of UCLA was recommended due

decline in short-term memory since the initial smoke inhalation exposure. He also reported psychiatric symptoms and mood swings, depression (situationally related), and is more quick-tempered. She noted that he has a history of substance abuse (marijuana, cocaine, speed and alcohol) and received treatment 25 years ago and has remained sober. At that time, he turned himself in to the railroad for substance abuse rehabilitation. He reported no other psychiatric premorbid symptoms. He worked for the BNSF Railroad since 1972 as a switchman, then later was promoted to conductor in 1983, and finally promoted to a locomotive engineer in 1993. He was working until the last incident in August 2010.

6.      Dr. Spencer O. Miller, The Nevada Neurosciences Institute at Sunrise Health, 3131 La

Canada Street, Suite 101, Las Vegas, Nevada 89169. (702) 731-8115

Dr. Weiss noted that "he exhibited intact functioning on information processing speed, benign constructions, comprehension, visual tracking skill, and certain areas of frontal/executive functioning (i.e., intact verbal abstraction, time abstraction, planning/organization for benign figures, benign mental flexibility and lack of vulnerability to interference effect. Mr. Nolan's benign, focused attention was in the low average range. Mr. Nolan's verbal memory functioning ranged from the average to low average range. His verbal memory functioning appeared to be stronger when semantic structure was provided for him (i.e., logical memory stories). He also performed more superior on verbal recognition memory. He mildly benefited when recall task was cued by semantic category (as exhibited on a CVLT-II). Conversely, visual memory functioning for free recall of information was impaired. His visual recognition memory ranged from the low average to average range. Mr. Nolan exhibited impairment in more complex visual-spatial/constructional ability. He has some mild word retrieval deficit. Mr. Nolan exhibited certain areas of frontal/executive impairment including impaired concept formation rule application, complex mental flexibility, complex alternating and sustained attention skill, verbal fluency/left frontal function, and planning/organizational approach for more complex material. His visual motor speed and coordination was in the low average range." She concluded that his test findings indicate "variable functioning with certain areas of intact function and other areas of cognitive compromise (as described above). Therefore, he certainly exhibits specified areas of cognitive impairment, but his overall neurocognitive picture does not meet full criteria for a dementia diagnosis at this time, from a neuropsychological standpoint." She recommended neurological evaluation, medication consult for ongoing insomnia, and neuroimaging.

<u>Dr. Spencer O. Miller (The Nevada Neurosciences Institute):</u> Initial note on 2/3/12 indicates that he was self-referred and was seen for complaints of cognitive decline, headaches, light-headedness, and insomnia with reported onset after two episodes of smoke inhalation.

He noted that per the claimant, he had inhaled the smoke for approximately 10 minutes before being able to exit the train following the incident on 6/26/10 when a fire broke out in the engine room of his locomotive. He saw his primary care doctor several days later and had negative chest x-ray, 98% oxygen saturation with exercise, and was released back to work without limitations shortly thereafter. He saw Dr. Ricardo Tan (Allergist) on 8/4/10 who felt his condition was likely reversible bronchial constriction likely related to untreated airway inflammation from smoke exposure. On 8/16/10, he was exposed to smoke inhalation again during a work related electrical fire as an engineer on a locomotive train. It is noted that he had no complaints prior to the first smoke inhalation injury, but afterwards he noted development of pulmonary difficulties, holo-cranial, intermittent headaches in variable locations on his scalp and deep in his head with associated light sensitivity and nausea. He also reported nightly insomnia, short- and long-term memory deficits (with worse short-term memory problems), reduced patience/quicker to anger, prefers to be alone, lack of enjoyment in certain activities or foods that he once enjoyed. He considers his inability to achieve sleep as the worst and most debilitating of his conditions. He has noted no improvement in his symptoms since the onset.

Medical history includes hypertension, coronary artery disease with stent placement in 2010; hyperlipidemia; diabetes mellitus; peripheral neuropathy (first noted in records on 1/30/12 by Dr. Mohamed Ahmed/Cardiologist); B12 deficiency, recurrent MRSA infections; right knee operation in 1985; left knee operation in 1980; and appendectomy. He had a single reported head injury from a high school football impact with reported brief loss of consciousness only. Medications at the time of this report include Lunesta, metoprolol, lisinopril, isosorbide mononitrate, glyburide, Effient, Lipitor, and aspirin.

On physical exam, mental status was intact. On MMSE, he missed repetition of one of 3 objects after distraction, but was "able to concentrate and complete all the rest of the test without problems." Speech was intact. Naming, fluency, repetition, and comprehension were intact. There were no cerebellar signs and gait was normal. Motor strength was intact and symmetric, with some tremor with fatigue (arms outstretched for 30 seconds). Sensory was moderate to severe distance dependent relatively symmetric sensory loss to light touch, temperature, vibration, and pinprick up to the knees and past the wrists.

<u>Dr. Spencer O. Miller (The Nevada Neurosciences Institute):</u> Note on 1/8/13 indicates that he is having sleep issues; wakes up 3 to 4 times per night.  He also reported headaches, tinnitus, vision problems, cognitive issues and nocturia.

Pertinent diagnoses included cognitive decline/mild cognitive impairment, sleep disturbances/insomnia, headaches, likely depression/anxiety, B12 deficiency, peripheral polyneuropathy (diabetic, B12 deficiency, other), and white matter lesions on MRI brain of unknown significance.  Dr. Miller concluded that "many of his complaints, although seeming to have originated after two episodes of smoke inhalation in 2010, are likely now more related to fatigue compounding some chronic comorbidities (i.e., diabetes, diabetic peripheral neuropathy, etc.) and some more acute and post-injury co-morbidities (i.e., potential chemical exposure, potential nutritional deficiencies, white matter changes noted on MRI brain, pulmonary impairment, headaches, etc.).  Prior extensive work up was reviewed, and most subspecialists and his primary care physician appear to concur that the majority of his complaints originated from the smoke inhalation injuries. He does not appear to have a genetic/inheritable/primary neurologic process that would cause cognitive decline based on history and imaging. Imaging is consistent with chronic smoke inhalation injuries and non-diffuse, deep white matter brief hypoxia.  From a neurologic perspective, more advanced white matter lesions and post-inhalation injuries can cause early cognitive decline that may or may not be progressive. Sleep disturbances are also common after various mechanisms of brain injury, and this may also be a potential source for his insomnia. He complains of symptoms that could be consistent with depression, which is also a contributor to sleep disturbances and cognitive decline. He is maintaining his activities of daily living per his own report." Dr. Miller recommended follow-up with his primary care doctor, lab panel, ophthalmology follow-up, sleep hygiene issues, nutrition consultation, B-12 injections, neuro-cognitive therapy if other recommendations ail to improve his overall symptomatology, neurology follow-up, and medications including treatment of headaches, peripheral pain, depression (minor anxiety), and sleep disturbance.

<u>Dr. Spencer O. Miller (The Nevada Neurosciences Institute):</u> Note on 5/14/13 indicates that he is more anxious and forgetful.


<u>Dr. Clarke Espy (Medical Industrial Evaluators):</u> Neurological consultation note on 8/29/11 indicates that neurologic exam was normal. Impressions included post-traumatic headaches and encephalopathy. He recommended a sleep study; Trazodone to help with sleep. He "apportioned 75% to the first exposure and 10% to the second exposure. The remaining apportionment would go to the pre-existing conditions that could have an effect on his memory such as prior alcoholism and risk factors for vascular disease such as hypertension, hyperlipidemia and diabetes." He informed the claimant that he could live with his chronic daily headache syndrome and take over-the-counter analgesics for this. He also assured him that his MRI and PET scans did not show any concern for the cause of a progressive dementia.

6.   *Dr. Thomas G. Dallman*
     *1355 Ramar Road*
     *Bullhead City, Arizona 86442*
     *Telephone (928) 763-9505*

*Dr. Dallman was plaintiff's primary care physician before and after the incidents. He is expected to have information concerning plaintiff's medical history, plaintiff's treatment since the incidents, and his communications with plaintiff regarding the incidents.*

**Defendant has included Dr. Dallman in each of the prior disclosures.**

**Although Plaintiff believes that defendant's designation and extensive**

**inclusion of Dr. Dallman's medical records in defendant's retained expert**

**reports indicates that Dr. Dallman would opine on the relevant factors**

included in Plaintiff's introduction to this supplemental response above,

Plaintiff states that Dr Dallman will  opine on the causal link between the incidents

of June 27, 2010 and August 14, 2010 and plaintiff's injuries, disability and damage.  He

will opine on the causal link between those injuries and plaintiff's premature retirement as

a railroad worker. He will opine on whether Plaintiff's pre-existing conditions and

symptoms affected  Plaintiff's ability to regularly execute the duties, functions and

responsibilities of his job with Defendant.  He will opine on whether Plaintiff's pre-existing

conditions and symptoms would have affected Plaintiff's long term plans to continue

working in his job with Defendant absent the incidents of June 27, 2010 and August 14,

2010. He will opine on how plaintiff's post incidents injuries and symptoms have affected

his earning capacity.  He will opine on the permanence of the injuries, conditions and

symptoms caused by the incidents of June 27, 2010 and August 14, 2010 and the effect on

plaintiff's activities of daily living. He will opine on the nature and extent of the

exacerbations caused to plaintiff's pre-existing conditions by the incidents of June 27, 2010

and August 14, 2010.


1.    Report and records from Dr. Ricardo Tan/California Allergy &

      Asthma Medical Group dated August 4, 2010 and September 7, 2010.

2.    Report from Dr. Robert Fisher/West Los Angeles Industrial & Urgent

      Care dated July 25, 2011.

3.     Report from Dr. Spence O. Miller/The Nevada Neurosciences

Institute dated February 3, 2012.

Dated: August 29, 2013     STOLPMAN, KRISSMAN, ELBER & SILVER

abnormal sleep patterns. He exercises with 30 minute walks every day and states that he is eating better. Impressions include fatigue and sleep dysfunction; recent onset of memory loss; and chronic hoarseness, possible reflux esophagitis. He continues to be disabled from his work as a locomotive engineer due to his fatigue and sleep dysfunction.

LLP

By:_____
     Dennis M. Elber
     Jarod A. Krissman
     Attorneys for Plaintiff
     PATRICK NOLAN

# EXHIBIT 4

**Jodi Taylor**

| | |
|---|---|
| **From:** | William Thorpe |
| **Sent:** | Tuesday, February 25, 2014 5:02 PM |
| **To:** | Dennis Elber |
| **Cc:** | 'KLC Secretary'; Brad Shwer; Kristin Paiva; William Thorpe |
| **Subject:** | RE: Nolan v BNSF:  Deposition of Dr. Fisher |

Based on this email, we have cancelled Dr. Fisher's deposition for tomorrow.

**From:** Dennis Elber [mailto:elber@skeslaw.com]
**Sent:** Tuesday, February 25, 2014 4:18 PM
**To:** William Thorpe
**Cc:** 'KLC Secretary'
**Subject:** RE: Nolan v BNSF: Deposition of Dr. Fisher

Bill
The deposition should go forward. I do not know whether I will call Dr. Fisher. However, when my office called him yesterday, we were told that he was out of the office ill, I believe. If you want to cancel it for tomorrow and then discuss whether his deposition needs to go forward, let's do it. I would be very surprised if I call him at trial but cannot make such a decision right now. I can confirm that I will not call Dr. Tan and if you want to take his deposition off, please do so based on this representation. I believe we can also work something out regarding Dr. Fisher so that an unnecessary deposition is not taken
Dennis

**From:** William Thorpe [mailto:wthorpe@thorpeshwer.com]
**Sent:** Tuesday, February 25, 2014 3:04 PM
**To:** Dennis M. Elber (elber@skes-law.com)
**Cc:** Brad Shwer; Kristin Paiva; William Thorpe
**Subject:** FW: Nolan v BNSF: Deposition of Dr. Fisher

I just got our email about a supplement.  Could I have an answer to my email below?

**From:** William Thorpe
**Sent:** Tuesday, February 25, 2014 3:41 PM
**To:** Dennis M. Elber (elber@skes-law.com)
**Cc:** Brad Shwer; Kristin Paiva; William Thorpe
**Subject:** Nolan v BNSF: Deposition of Dr. Fisher

Dennis:  During our telephone conference concerning BNSF's objections to plaintiff's expert witness designations, you mentioned that you did not intend to depose Dr. Fisher or call him as a witness at trial, even though plaintiff listed him as an expert on his Rule 26 statement.  As you know, we have scheduled Dr. Fisher's deposition for tomorrow because of plaintiff's designation of him as an expert witness.  Today was the first time you have ever told us that plaintiff does not intend to call him as a witness.   If this representation is accurate, we have no interest in proceeding with Dr. Fisher's deposition tomorrow, and will see what we can do about cancelling it immediately and obtaining a refund of whatever money has been spent in connection with the deposition.  Accordingly, please confirm that plaintiff does not intend to call Dr. Fisher or to otherwise rely on his medical records at trial so that we may proceed with cancelling the deposition.  Thanks for your anticipated prompt response.  Bill